# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UBS FINANCIAL SERVICES,
INCORPORATED; CITIGROUP GLOBAL
MARKETS, INCORPORATED,

　　　　　*Plaintiffs-Appellants,*

　　　　　　　v.

CARILION CLINIC,

　　　　　*Defendant-Appellee.*

No. 12-2066

Appeal from the United States District Court
for the Eastern District of Virginia, at Richmond.
John A. Gibney, Jr., District Judge.
(3:12-cv-00424-JAG)

Argued: December 4, 2012

Decided: January 23, 2013

Before NIEMEYER, KEENAN, and DIAZ, Circuit Judges.

Affirmed by published opinion. Judge Niemeyer wrote the
opinion, in which Judge Keenan and Judge Diaz joined.

## COUNSEL

**ARGUED:** Jonathan K. Youngwood, SIMPSON THACHER
& BARTLETT, LLP, New York, New York, for Appellants.
James R. Swanson, FISHMAN HAYGOOD PHELPS

WALMSLEY & SWANSON LLP, New Orleans, Louisiana, for Appellee. **ON BRIEF:** Hugh McCoy Fain, III, Edward E. Bagnell, Jr., SPOTTS FAIN PC, Richmond, Virginia, for Appellants; Jay Cohen, PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLC, New York, New York, for Appellant Citigroup Global Markets, Inc. Jason W. Burge, Alysson L. Mills, FISHMAN HAYGOOD PHELPS WALMSLEY & SWANSON LLP, New Orleans, Louisiana; Patrick T. Fennell, CRANDALL & KATT, Roanoke, Virginia, for Appellee.

---

## OPINION

NIEMEYER, Circuit Judge:

This case presents the question of whether UBS Financial Services, Inc. ("UBS") and Citigroup Global Markets, Inc. ("Citi") are required, as members of the Financial Industry Regulatory Authority, Inc. ("FINRA"), to arbitrate disputes arising out of the services they provided to Carilion Corporation in connection with its multi-million dollar bond issues. Carilion claimed that during the course of providing those services, UBS and Citi made numerous misrepresentations to it and breached numerous duties. To resolve its claims, Carilion initiated an arbitration proceeding against UBS and Citi under FINRA Rule 12200 (which requires FINRA members to arbitrate disputes with a customer at the customer's request).

UBS and Citi commenced this action to enjoin the arbitration proceedings, contending that Carilion was not a "customer" as that term is used in FINRA Rule 12200 and that, in any event, Carilion waived any right to arbitrate by agreeing to the forum selection clause contained in written agreements with UBS and Citi. The district court rejected these arguments and denied UBS and Citi's motion for injunctive relief.

We affirm. As explained herein, we conclude that Carilion, by purchasing UBS and Citi's services, was indeed a "customer" entitled to arbitration under FINRA Rule 12200 and that the forum selection clause relied on by UBS and Citi did not have the effect of superseding or waiving Carilion's right to arbitrate.

I

Carilion is a not-for-profit healthcare organization that operates hospitals and clinics in Virginia. In 2005, it decided to issue municipal bonds to finance the renovation and expansion of one of its hospitals and to refinance existing debt. Carilion retained UBS and Citi to advise it on the structure of the bond issues and to assist it in implementing the financing plan.

As Carilion alleges in its statement of claim filed with FINRA, UBS and Citi recommended that Carilion issue a large percentage of its bonds as "auction-rate bonds" and purchase interest rate swaps to hedge against interest rate fluctuations on those bonds. Auction-rate bonds are long-term, variable-rate instruments for which the interest rates are reset periodically through an auction process. During the process, bidders place purchase and sell orders for the bonds through broker-dealers who have contracted with the issuer. The bonds are then sold at the lowest rate at which they can be sold at par. If there are insufficient orders to purchase all of the bonds being sold at auction, the auction "fails," and the interest rate jumps to a contractual maximum rate until the next auction.

Carilion followed UBS and Citi's advice and accordingly, in December 2005, issued $234,225,000 in face value of auction-rate bonds and $74,240,000 in face value of daily-rate bonds (which are not at issue in this case).

In addition to providing Carilion with advice on the structure of the bond issues, Carilion claims that UBS and Citi also

(1) served as underwriters for the auction-rate bonds, purchasing the bonds from Carilion and reselling them to investors; (2) served as lead broker-dealers for Carilion's auction-rate bond auctions; (3) sold to Carilion, through their affiliates, interest rate swaps that they had recommended to protect Carilion from fluctuations in the bonds' interest rates; (4) acted as Carilion's agents in dealing with the rating agencies; (5) conducted discussions with bond insurers on Carilion's behalf; and (6) provided monitoring and advisory services on the bonds and the swaps. For their services, UBS and Citi earned an underwriter's discount, part of which constituted a management fee for their assistance in structuring and managing the transaction, and annual broker-dealer fees of 25 basis points in exchange for managing the auction-rate bond auctions.

The parties documented their business arrangements in two types of contracts—broker-dealer agreements and underwriting agreements. The broker-dealer agreements, executed on December 1, 2005—two with UBS and two with Citi—provided that UBS and Citi would run the periodic auctions. The underwriting agreements, executed on December 13, 2005—one with UBS and one with Citi—provided that UBS and Citi would purchase the auction-rate bonds from Carilion and resell them to the public.

As Carilion alleges in its arbitration claim, in February 2008, the auction-rate bond market for Carilion's bonds collapsed when UBS and Citi stopped submitting support bids for the bonds at the auctions. Carilion's interest payments skyrocketed, and the swaps did not provide the designed protection. Consequently, Carilion was forced to refinance, losing millions of dollars in the process. Carilion claimed that UBS and Citi misled it on the true nature of the auction-rate bond market by failing to disclose that they had a practice of placing support bids to prevent failure at every auction for which they were the lead broker-dealer. Carilion claimed that UBS and Citi's conduct violated their fiduciary duty,

amounted to fraud and negligent misrepresentation, violated the Securities Exchange Act of 1934, violated the Virginia Securities Act, and violated Municipal Securities Rulemaking Board ("MSRB") and FINRA duties. To resolve these claims, Carilion initiated the arbitration proceedings with FINRA on February 11, 2012, naming UBS and Citi as respondents.

FINRA is a private self-regulatory organization, formed in 2007, that has "the authority to exercise comprehensive over-sight over 'all securities firms that do business with the public.'" *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011) (quoting 72 Fed. Reg. 42169, 42170 (Aug. 1, 2007)). Both UBS and Citi are FINRA members and, when becoming FINRA members, agreed to comply with its rules. *See* FINRA Bylaws, art. IV, § 1(a). FINRA Rule 12200 provides that when customers so request, FINRA members must participate in arbitration under the FINRA Code of Arbitration Procedures, so long as "[t]he dispute is between a customer and a member or associated person of a member; and [t]he dispute arises in connection with the business activities of the member or the associated person."

After Carilion initiated arbitration proceedings, UBS and Citi commenced this action, seeking a declaratory judgment that FINRA lacks jurisdiction over the arbitration and an injunction against the arbitration proceedings. In a motion for a preliminary injunction, UBS and Citi contended (1) that Carilion was not a "customer" entitled to arbitration under the FINRA Rules; and (2) that Carilion, in any event, agreed, in the forum selection clause of the broker-dealer agreements, to litigate, rather than arbitrate, all disputes in a federal court in New York County.

The district court denied UBS and Citi's motion for a pre-liminary injunction, focusing primarily on why UBS and Citi were unlikely to succeed on the merits. *UBS Fin. Servs., Inc. v. Carilion Clinic*, No. 3:12CV424-JAG, 2012 WL 3112010 (E.D. Va. July 30, 2012). The court concluded that Carilion

was a "customer" under the FINRA Rules because (1) there is a federal policy favoring arbitration; (2) Carilion was within the plain meaning of the term "customer"; (3) "other courts have consistently held that an issuer of municipal securities who purchased financial services from a FINRA member is a customer under FINRA rules"; and (4) "FINRA itself seems to have rejected the plaintiffs' argument." *Id.* at *3-6. The court also concluded that the forum selection clause in the broker-dealer agreements did not displace UBS and Citi's arbitration obligation, concluding that (1) there is a federal policy favoring arbitration; (2) "the language of the forum selection clause is susceptible to an interpretation favoring arbitration" because it only requires "actions and proceedings" to be brought in federal court and does not mention arbitration; and (3) UBS and Citi's interpretation "conflicts with FINRA's practices with respect to scheduling arbitration." *Id.* at *6-7.

When, following the district court's ruling, the parties agreed that there was nothing further to litigate, the court entered final judgment on August 24, 2012, dismissing the action. This appeal followed.

II

UBS and Citi, as FINRA members, are generally required by the FINRA Rules to arbitrate disputes with customers when (1) arbitration is "requested" by the customer and (2) the dispute "arises in connection with the business activities of the member." FINRA Rule 12200.[1] Carilion, claiming to be

---

[1]FINRA Rule 12200 provides:

Parties must arbitrate a dispute under the Code if:

-Arbitration under the Code is either:

(1) Required by a written agreement, or

(2) Requested by the customer;

a "customer" of UBS and Citi, requested arbitration of its claims that UBS and Citi breached duties in connection with services they provided to Carilion on its auction-rate bond issues. The parties agree that if Carilion was indeed a "customer" of UBS and Citi, UBS and Citi became contractually obligated to proceed with arbitration on Carilion's request (unless, of course, Carilion waived its right to arbitration, as claimed by UBS and Citi and as is addressed in Part III, below). But UBS and Citi claim that Carilion was not a "customer," as that term is used in the FINRA Rules, and that therefore they have no contractual obligation to arbitrate. They maintain that Carilion's claims did not "relate to a brokerage account or investment relationship with UBS or Citi" and that the term customer under the FINRA Rules is limited to persons who received investment or brokerage services, citing *Fleet Boston Robertson Stephens, Inc. v. Innovex, Inc.*, 264 F.3d 770 (8th Cir. 2001) (holding that a party receiving banking and financial advice was not a "customer" under the National Association of Securities Dealers ("NASD") Rules and therefore could not invoke members' arbitration obligations).

Carilion argues that "customer," as used in the FINRA Rules, is a broad term that is not limited to only investors. It contends that the scope of FINRA's regulation is broader than just protecting investors and that courts have not so limited the term "customer" in construing the FINRA Rules. Relying on a dictionary definition, Carilion claims that a customer is anyone "who purchases some commodity or service."[2]

-The dispute is between a customer and a member or associated person of a member; and

-The dispute arises in connection with the business activities of the member or the associated person, except disputes involving the insurance business activities of a member that is also an insurance company.

[2]Carilion also argues that the federal policy favoring arbitration, *see AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1745 (2011), weighs

In becoming members of FINRA, UBS and Citi agreed to mandatory arbitration of specified disputes with customers when the customer "requests" such arbitration. Thus, when Carilion initiated arbitration proceedings, it invoked UBS and Citi's obligation under the FINRA Rules, giving rise to a contractual obligation to arbitrate if in fact Carilion qualified as a "customer," as that term is used in the FINRA Rules. *See Wash. Square Sec., Inc. v. Aune*, 385 F.3d 432, 435 (4th Cir. 2004). Thus, what constitutes a "customer" lies at the heart of whether UBS and Citi have an obligation to arbitrate.

The FINRA Rules do not define "customer." They do limit the term to exclude from its scope any "broker or dealer."

---

in favor of a ruling that it is a "customer" of UBS and Citi. That federal policy creating a presumption in favor of arbitration, however, applies only where a validly formed and enforceable arbitration agreement exists and its scope is ambiguous. *See Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2858–59 (2010). The Supreme Court "has never held that the presumption overrides the principle that a court may submit to arbitration 'only those disputes . . . the parties have agreed to submit.'" *Id.* (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)).

Here, an agreement to arbitrate exists only if a *customer* requests arbitration from a member. The question of whether a person requesting arbitration is a customer must be resolved to determine the existence of a contract to arbitrate, not the scope of an arbitration agreement. Carilion's reliance on *Washington Square Securities, Inc. v. Aune*, 385 F.3d 432 (4th Cir. 2004), where the court applied a presumption of arbitration in somewhat similar circumstances is not useful here because in *Washington Square*, the investors were concededly customers of an associated person. *See id.* at 436 (noting that it was "undisputed that the Investors were customers of [the broker], and that [the broker] was an associated person of the member").

Consequently, in this case we address whether Carilion was a customer as a question of contract law and without considering the presumption in favor of arbitration. *See Concepcion*, 131 S. Ct. at 1745 (noting that the Federal Arbitration Act reflects the "fundamental principle that arbitration is a matter of contract" (quoting *Rent-A-Center, West, Inc. v. Jackson*, 130 S. Ct. 2772, 2776 (2010)).

FINRA Rule 12100(i).[3] But as to non-brokers and non-dealers, the term is left undefined. Nonetheless, the FINRA Rules do give an informing context by providing that arbitrable disputes must arise in connection with the "business activities" of the FINRA member, thus suggesting that for a person to obtain arbitration, the person must be a customer with respect to a FINRA member's business activities. *See* FINRA Rule 12200. The FINRA Rules give further context by suggesting that the business activities of a FINRA member involve "investment banking or securities business." *See* FINRA Rule 12100(r).[4] Finally, the scope of FINRA's regulatory interest similarly indicates the scope of relevant business activities. FINRA's mission, among other things, is "[t]o promote through cooperative effort the *investment banking and securities business*, to standardize its principles and practices, to promote therein high standards of commercial honor, and to encourage and promote among members *observance of federal and state securities laws*;" "[t]o adopt, administer, and enforce rules of fair practice and rules to prevent fraudulent and manipulative acts in practices"; and "[t]o promote self-discipline among members, and *to investigate and adjust grievances between the public and members* and between members." Restated Certificate of Incorporation of Financial

---

[3]FINRA Rule 12100(i) provides, "A customer shall not include a broker or dealer."

[4]FINRA Rule 12100(r) provides:

The term "person associated with a member" means:

(1) A natural person who is registered or has applied for registration under the Rules of FINRA; or

(2) A sole proprietor, partner, officer, director, or branch manager of a member, or other natural person occupying a similar status or performing similar functions, *or a natural person engaged in the investment banking or securities business who is directly or indirectly controlling or controlled by a member*, whether or not any such person is registered or exempt from registration with FINRA under the By-Laws or the Rules of FINRA. (Emphasis added).

Industry Regulatory Authority, Inc. § 3 (July 2, 2010) (emphasis added); *see also W. Va. Univ. Hosps.*, 660 F.3d at 652 (using FINRA's Restated Certificate of Incorporation to "reject UBS's contention that FINRA has a narrow 'investor-protection mandate'").

But subject to the scope indicated by its context in the FINRA Rules, the term "customer" in Rule 12200 still retains its generally accepted meaning—"one that purchases a commodity or service." *Merriam-Webster's Collegiate Dictionary* 308 (11th ed. 2007).

Coupling the contextual indicators from FINRA and the dictionary definition of "customer," we thus conclude that when FINRA uses "customer" in Rule 12200, it refers to one, not a broker or dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are covered by FINRA's regulation, namely the activities of investment banking and the securities business. To construe "customer" in a manner that is consistent with the context of the FINRA Rules serves not only to provide customers of FINRA members the opportunity to arbitrate disputes arising in connection with FINRA members' business activities, but also to fulfill FINRA's charter "to investigate and adjust grievances between the public and members."

Our definition is also fully supported by the decisions of other courts that have faced analogous questions of who is a "customer" within the meaning of FINRA Rule 12200. *See W. Va. Univ. Hosps.*, 660 F.3d at 648-53; *UBS Fin. Servs. Inc. v. City of Pasadena*, No. CV 12-05019-RGK (JCx), 2012 WL 3132949, at *4-5 (C.D. Cal. July 31, 2012); *J.P. Morgan Sec. Inc. v. La. Citizens Prop. Ins. Corp.*, 712 F. Supp. 2d 70, 77-79 (S.D.N.Y. 2010).

In *West Virginia University Hospitals*, UBS sought to enjoin arbitration under the FINRA Rules, as it did here, con-

tending that West Virginia University Hospitals was not a "customer." 660 F.3d at 647-48. Just as here, UBS had provided services to West Virginia University Hospitals in connection with the Hospitals' issuance of auction-rate bonds. The court observed that UBS served West Virginia University Hospitals "as both the lead underwriter and the main broker-dealer responsible for facilitating the Dutch auctions in which [the Hospitals'] bonds were resold and their interest rates set." *Id.* at 646. In concluding that West Virginia University Hospitals was a "customer" of UBS entitled to FINRA arbitration, the Second Circuit held that the term "customer" in FINRA Rule 12200 "includes at least a non-broker or non-dealer who purchases, or undertakes to purchase, a good or service from a FINRA member." *Id.* at 650. Thus, because West Virginia University Hospitals "purchased a service, specifically auction services, from UBS," it was UBS's customer. *Id.*

In reaching its conclusion, the court rejected the same arguments that UBS and Citi make here—that the term "customer" is restricted by FINRA's investor-protection mandate to those persons receiving investment or brokerage services. The court explained that while FINRA's mission does indeed include investor protection, its role and scope of authority is clearly broader:

> FINRA's purposes are not limited to investor protection. Rather, as previously noted, FINRA serves as the sole self-regulatory organization chartered under the Exchange Act and exercises comprehensive oversight of the securities industry. Among its stated purposes are to "encourage and promote among members observance of federal and state securities laws"; "[t]o investigate and adjust grievances between the public and members and between members"; and "[t]o adopt, administer, and enforce rules of fair practice." UBS does not explain why "customer" should be limited to investors in light of FINRA's purposes, its other broad definitions of

"customer" applicable to other provisions, and the ordinary usage of the term.

*W. Va. Univ. Hosps.*, 660 F.3d at 652 (citations omitted). We find the court's reasoning persuasive and equally applicable to the circumstances here.

UBS and Citi rely heavily on the Eighth Circuit's decision in *Fleet Boston* to support their more limited definition of "customer" as referring to investors. In *Fleet Boston*, the court construed language in the NASD Rules, a predecessor to the FINRA Rules, and rejected a claim that "customer" means broadly "everyone who is not a broker or dealer." 264 F.3d at 772. The court explained, "We do not believe that the NASD Rules were meant to apply to every sort of financial service an NASD member might provide, regardless of how remote that service might be from the investing or brokerage activities, which the NASD oversees." *Id.* It then found that the NASD Rules support a general definition of "customer" as "one who receives investment and brokerage services *or otherwise deals more directly with securities than what occurred here*." *Id.* (emphasis added). The court, however, did not explain its definition further by describing what relationship might deal "more directly with securities than what occurred here." For this reason and because the court was faced with a purported customer who had merely received financial advice, we cannot take its holding to limit the scope of "customer" to "one who receives investment and brokerage services," as UBS and Citi argue.

UBS and Citi also contend that finding Carilion to be a customer "creates an unnecessary conflict between FINRA and MSRB rules" because Carilion, as a new issuer of securities, would be a "customer" under the FINRA Rules but not under the MSRB Rules. The MSRB (Municipal Securities Rulemaking Board) is a self-regulatory organization that, similar to FINRA, regulates the municipal securities market.

MSRB Rule D-9 defines a customer as "any person other than a broker, dealer, or municipal securities dealer acting in its capacity as such or an issuer in transactions involving the sale by the issuer of a new issue of its securities." Thus, while Carilion is a customer under the FINRA Rules, as we hold, it might not be a customer under the MSRB Rules. But being subject to two different regulatory schemes, each of which defines customer differently, does not necessarily create any tension. To be sure, Carilion was a new issuer of municipal securities and therefore might not have been a customer under the MSRB Rules. But it also purchased underwriting and auction services from UBS and Citi and therefore was a customer of those entities for purposes of arbitrating disputes arising out of the business activities of those FINRA members. UBS and Citi have not demonstrated how these regulatory differences create irreconcilable conflicts.

UBS and Citi further contend that the broker-dealer agreements they entered into with Carilion used "customer" to refer to investors purchasing Carilion's bonds and thus indicate that Carilion is not a customer of UBS or Citi. The broker-dealer agreements, however, were written to serve the purposes of those agreements such that their labeling the purchasers of bond securities from Carilion as customers does not foreclose reaching the conclusion that Carilion itself was also a customer of UBS or Citi with respect to their services. Moreover, even though parties are free to exempt themselves from Rule 12200, their private agreements do not alter the definition of "customer" in the FINRA Rules.

Finally, UBS and Citi argue that our holding is inconsistent with FINRA's stated purpose of "protecting investors." As we have already pointed out, however, even though FINRA undertakes in its mission to protect investors, it also serves a broader purpose, that of serving as "the sole self-regulatory organization chartered under the Exchange Act to exercise comprehensive oversight of the securities industry." *W. Va. Univ. Hosps.*, 660 F.3d at 652. Its mission includes the spe-

cific purpose of promoting observance of federal and state securities laws and investigating and adjusting grievances between the public and FINRA members under those laws. *See* Restated Certificate of Incorporation of Financial Industry Regulatory Authority, Inc. § 3 (July 2, 2010). FINRA Rule 12200 serves that mission.

In short, we conclude that "customer," as that term is used in the FINRA Rules, refers to one, not a broker or a dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities insofar as those activities are regulated by FINRA—namely investment banking and securities business activities.

We have little difficulty concluding that Carilion is such a "customer." To finance the renovation and expansion of its hospital and refinance debt, Carilion issued over $308 million in bonds, some $234 million of which were auction-rate bonds. To assist it in structuring and underwriting the financing, Carilion retained UBS and Citi, entering into broker-dealer and underwriting agreements with them. Pursuant to these agreements, UBS and Citi advised Carilion on the structure of its financing; served as the underwriters for the auction-rate bonds, meaning that they purchased the bonds from Carilion and resold them to investors; served as the lead broker-dealers for Carilion's auction-rate bond auctions; sold to Carilion, through affiliates, interest rate swaps, which they recommended to protect the financing structure; acted as Carilion's agents in dealing with the rating agencies; conducted discussions with bond insurers on Carilion's behalf; and provided monitoring and advisory services on the bonds and the swaps. For their services, UBS and Citi earned an underwriter's discount, part of which constituted a management fee for their assistance in structuring and managing the transaction, and annual broker-dealer fees of 25 basis points in exchange for managing the auction-rate bond auctions.

Because Carilion, as a customer of UBS and Citi, has requested arbitration, UBS and Citi as FINRA members are

obligated to participate in the arbitration pursuant to the FINRA Rules.

## III

As a separate and distinct argument, UBS and Citi contend that the broker-dealer agreements signed by the parties specifically provide that all disputes between the parties, including those disputes at issue in the FINRA arbitration commenced by Carilion, "must be litigated in federal court," thus displacing UBS and Citi's more general obligation to arbitrate under FINRA Rule 12200. They rely on the forum selection clause which provides at its core, "all actions and proceedings arising out of this Agreement . . . shall be brought in the United States District Court the County of New York."[5] While the clause appears only in the broker-dealer agreements and not in the underwriting agreements, UBS and Citi argue that by its language, the clause also applies to any of the transactions "contemplated" by the parties, including the transactions covered by the underwriting agreements.

At the outset, we agree with UBS and Citi that the obligation to arbitrate under FINRA Rule 12200 can be superseded and displaced by a more specific agreement between the parties. *See In re Am. Express Fin. Advisors Sec. Litig.*, 672 F.3d 113, 132 (2d Cir. 2011) (explaining that "different or additional contractual arrangements for arbitration can supersede the rights conferred on [a] customer by virtue of [a] broker's membership in a self-regulating organization such as [FINRA]" (quoting *Kidder, Peabody & Co. v. Zinsmeyer Trusts P'ship*, 41 F.3d 861, 864 (2d Cir. 1994) (alterations in original)); *see also Smith Barney, Inc. v. Critical Health Sys. of N.C., Inc.*, 212 F.3d 858, 862 (4th Cir. 2000) ("We join the Second and Eleventh Circuits in holding that the [provision in the American Stock Exchange Constitution allowing for the

---

[5]The County of New York is coterminous with the Borough of Manhattan within the City of New York.

customer to elect to arbitrate before the American Arbitration Association] can be superseded by a more specific agreement"). Any such provision, however, must be sufficiently specific to impute to the contracting parties the reasonable expectation that they are superseding, displacing, or waiving the arbitration obligation created by FINRA Rule 12200. *Cf. Smith Barney*, 212 F.3d at 861 (interpreting whether a client agreement prevented arbitration in the defendant's desired forum based on the plain language of the agreement); *Applied Energetics, Inc. v. NewOak Capital Mkts., LLC*, 645 F.3d 522, 525 (2d Cir. 2011) (finding that an adjudication clause displaced an arbitration clause because "[b]oth provisions are all-inclusive, both are mandatory, and neither admits the possibility of the other").

Therefore, the question presented is whether the forum selection clause in the broker-dealer agreements provides that Carilion's right to arbitrate under FINRA Rule 12200 is superseded, displaced, or waived. This comes down to a straightforward issue of contract interpretation.

The forum selection clause in the broker-dealer agreements, on which UBS and Citi rely, provides:

> The parties agree that *all actions and proceedings* arising out of this Agreement or any of the transactions contemplated hereby *shall be brought in the United States District Court* in the County of New York. To the extent permitted by law, *each of the parties hereto also irrevocably waives all right to trial by jury in any action, proceeding* or counter-claim arising out of this Agreement or the transactions contemplated hereby.

(Emphasis added). UBS and Citi argue that this clause means that all disputes must be resolved by litigation in the United States District Court in New York County and thus, by implication, supersedes and displaces their obligation to arbitrate

disputes. From the premises that (1) arbitration is an "action or proceeding"; (2) all actions or proceedings must be brought in the United States District Court; and (3) FINRA arbitration cannot take place in the district court, they reason to the conclusion that FINRA arbitration therefore is precluded.

There are several problems inherent in this logical construct. *First*, if the term "actions and proceedings" as used in the agreements includes arbitration (for indeed an arbitration is a proceeding), then the sentence would have to be read to recognize that arbitration remains available but must be "brought" in court. Under this proposal, the sentence would state that "all proceedings, including arbitration . . . shall be brought in" court. In whatever way that sentence could be read, it could not be read to *preclude* arbitration; to the contrary, it presumes its availability but localizes it, albeit to a forum where it could not be pursued. But even that proposition could be questioned because a court plays a role in arbitration proceedings by compelling the arbitration and enforcing any arbitration award. Regardless of how one might explain the commitment of an arbitration proceeding to a court, the sentence surely cannot be read to preclude or waive arbitration.

*Second*, one would reasonably expect that a clause designed to supersede, displace, or waive arbitration would mention arbitration. To be sure, the sentence might be found to refer to arbitration through use of the word "proceedings," but then again the sentence does not suggest that such arbitration is superseded, displaced, or waived.

*Third*, if UBS and Citi are correct in construing "actions and proceedings" with sufficient breadth to include an arbitration proceeding, then the remaining portion of the paragraph becomes nonsensical. Under this construction, an arbitration proceeding would be "brought in the United States District Court" and as to any such action or proceeding, "all right to trial by jury" would be waived. The more reasonable con-

struction would take the references to "court" and "jury trials" as limiting what is meant by "actions and proceedings." Thus, read in the context of courts and jury trials, the term "actions and proceedings" would be understood as a term of art, as used, for example, in Federal Rule of Civil Procedure 1 (providing in part, "These rules govern the procedure in all *civil actions and proceedings* in the United States district courts" (emphasis added)). Similarly, the New York Civil Practice Law and Rules primarily use "action" and "proceeding" to refer to *judicial* disputes, *not to arbitration. See Int'l Union of Operating Eng'rs, Local No. 463 v. City of Niagara Falls*, 743 N.Y.S.2d 236, 238 (N.Y. Sup. Ct. 2002) ("An arbitration is not considered an action or a proceeding"), *aff'd sub nom. Bathurst v. City of Niagara Falls*, 298 A.D.2d 1010 (N.Y. App. Div. 2002). The approach of construing "actions and proceedings" when used in the context of courts and jury trials to refer to judicial actions is the approach generally followed by other courts. *See, e.g.*, *Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*, 297 F.3d 388, 395-96 (5th Cir. 2002) (interpreting agreement requiring "any suit or proceeding" to be subject to the exclusive jurisdiction of the Texas courts not to include arbitration).

We find it a more natural reading of the forum selection clause to require that any *litigation* arising out of the agreement would have to be brought in the United States District Court in New York County and that as to any such action or proceeding, a jury trial would be waived. And we believe that it would never cross a reader's mind that the clause provides that the right to FINRA arbitration was being superseded or waived. No word even suggesting supersedence, waiver, or preclusion exists in the sentence.

For these reasons, we reject UBS and Citi's suggestion that the forum selection clause in the broker-dealer agreements supersedes, displaces, or waives the arbitration otherwise provided by FINRA Rule 12200.

The judgment of the district court is accordingly

*AFFIRMED.*