PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

RAYMOND JAMES FINANCIAL
SERVICES, INCORPORATED,

                *Plaintiff-Appellee,*

          v.

PETER CARY; DAYNA SMITH;
ROBERT BARKIN; CHRISTINE SPOLAR,

             *Defendants-Appellants,*

            and

FINANCIAL INDUSTRY REGULATORY
AUTHORITY,

                  *Defendant.*

            No. 12-1053

PUBLIC INVESTORS ARBITRATION BAR
ASSOCIATION,

     *Amicus Supporting Appellants.*

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Gerald Bruce Lee, District Judge.
(1:11-cv-00928-GBL-TRJ)

Argued: January 30, 2013

Decided: March 8, 2013

Before WILKINSON, KEENAN, and WYNN,
Circuit Judges.

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Keenan and Judge Wynn joined.

---

**COUNSEL**

**ARGUED:** John Stringer Chapman, CHAPMAN & ASSO-CIATES, LLC, Cleveland, Ohio, for Appellants. Stephen Grey Cochran, ROEDER & COCHRAN, PLLC, McLean, Virginia, for Appellee. **ON BRIEF:** Alin L. Rosca, JOHN S. CHAPMAN & ASSOCIATES, LLC, Cleveland, Ohio; J. Casey Forrester, ECONOMOU, FORRESTER & RAY, Alexandria, Virginia, for Appellants. Braden W. Sparks, BRADEN W. SPARKS, PC, Dallas, Texas; Lisa A. Catalano, Director, ST. JOHN'S UNIVERSITY SCHOOL OF LAW, Securities Arbitration Clinic, Jamaica, New York; Gina-Marie Scarpa, ST. JOHN'S UNIVERSITY SCHOOL OF LAW, Securities Arbitration Clinic, Queens, New York, for Amicus Supporting Appellants.

---

**OPINION**

WILKINSON, Circuit Judge:

Appellants are individual investors seeking to arbitrate claims against appellee Raymond James Financial Services ("RJFS") that arose when the investors purchased allegedly fraudulent securities directly from Inofin, Inc. ("Inofin"). As a member of the Financial Industry Regulatory Authority ("FINRA"), RJFS has agreed to arbitrate any dispute with a "customer" that "arises in connection with the business activities" of the firm. Appellants contend that they are RJFS customers because they purchased Inofin securities on the advice of an attorney who, though lacking any formal affiliation with RJFS, was a business and personal acquaintance of an RJFS registered representative.

For the reasons that follow, we hold that appellants are not "customers" of RJFS within the meaning of the FINRA arbitration provisions. To compel arbitration here would be to expand the scope of the arbitration agreement beyond what the text permits and the parties intended. Therefore, we affirm the judgment of the district court.

I.

Inofin is a Massachusetts corporation that raised over $110 million from hundreds of investors between 1994 and 2010. Around 2003, Inofin president Michael Cuomo recruited his former college roommate Kevin Keough, then a registered representative of Morgan Stanley Dean Witter, Inc. ("Morgan Stanley"), and David Affeldt, Keough's friend, brokerage customer, and tax attorney, to refer investors to Inofin. These investors purchased unregistered promissory notes directly from Inofin, believing that the company was investing in subprime auto loans.

According to the Securities and Exchange Commission ("SEC"), Keough wanted to avoid receiving referral compensation directly from Inofin because he was employed by Morgan Stanley, a regulated broker-dealer. Cuomo and Keough thus agreed that Inofin would pay Keough's wife, Nancy Keough ("Nancy"), for Keough's referrals. Sometime in 2003, Nancy and Affeldt agreed to share equally in any referral fees they received from Inofin, regardless of who made the actual referral. At the time this agreement was concluded, Keough was still employed by Morgan Stanley. Three years later, in 2006, he joined RJFS, and his wife continued to share Inofin referral fees with Affeldt.

In January 2011, Inofin revealed that it was insolvent following protracted losses that began in 2004 after the company commenced new types of lending that were not properly disclosed to investors. Shortly after Inofin's financial state came to light, the company entered bankruptcy, and the SEC insti-

tuted civil enforcement proceedings against the company and its executives for violations of the federal securities laws.

Appellants Peter Cary, Dayna Smith, Robert Barkin, and Christine Spolar are Inofin investors who sustained losses on the unregistered promissory notes. They purchased the notes between 2006 and 2008 after Affeldt "personally met with each of [them] and recommended each invest in Inofin." J.A. 84. Both Nancy and Affeldt received commissions from Inofin for these transactions.

On May 24, 2011, the investors filed a joint FINRA Statement of Claim against RJFS, alleging, *inter alia*, violations of state securities laws and FINRA conduct rules. The investors alleged that Keough assured them that "their investments were fully collateralized by auto loans" when Inofin was actually "operating a Ponzi scheme" in which executives diverted the invested funds "towards propping up their own failing businesses" and "covering personal expenses." J.A. 23, 26. The investors sought arbitration of their claims pursuant to FINRA Rule 12200, which requires FINRA members such as RJFS to arbitrate disputes "between a customer and a member or associated person of a member" if arbitration is "requested by the customer" and the dispute "arises in connection with the business activities of the member or the associated person."

On September 2, 2011, RJFS commenced this lawsuit in the Eastern District of Virginia, seeking declaratory and injunctive relief barring arbitration of the investors' claims on the grounds that the FINRA arbitration provisions do not apply to the dispute because appellants "are not and have never been [RJFS] customers." J.A. 11. Shortly thereafter, the parties stipulated to the following "key operative facts" concerning the putative relationships among appellants, Affeldt, Inofin, and RJFS:

1.  The investors had "no personal contact" with Keough regarding Inofin.

2.  Affeldt "personally met" with the investors and "recommended each invest in Inofin."

3.  The investors did not hold "any accounts including trade accounts" with RJFS "at any time."

4.  Affeldt did not tell the investors that he was "acting for a person who claimed to be" an RJFS representative.

5.  Affeldt "did not represent" to the investors that he was "affiliated with" RJFS.

6.  The investors "did not understand that they were purchasing Inofin or any other security" from RJFS.

7.  The investors "did not understand they were purchasing Inofin from an agent whom they believed to be authorized to act on behalf of" RJFS.

Following a hearing on the matter, the district court found that the connection between RJFS and appellants was "insufficient" to bring the dispute within the scope of the FINRA arbitration provisions. J.A. 717. The district court therefore granted RJFS's motion for a permanent injunction barring arbitration of the investors' claims. This appeal followed.

## II.

Appellants (the investors) contend that their claims are subject to arbitration because David Affeldt, the attorney who recommended the Inofin securities to them, had connections to Kevin Keough, an RJFS registered representative. Appellants urge us to read FINRA Rule 12200 broadly –- in accordance with the judiciary's longstanding presumption in favor of arbitration—and find that they are, in fact, RJFS customers.

However, we conclude that no presumption in favor of arbitration applies in this case and that appellants are not customers of RJFS under our established interpretation of Rule 12200. A customer very often relies upon the representations or reputation of the entity with which the customer deals, but in this case, the investors made their decision to invest independently of any recommendation on the part of RJFS. To find a customer relationship in such a situation would impose responsibility on a company whose name was never so much as utilized to induce the investors to part with their funds.

### A.

Appellants argue here, as they did below, that "any ambiguity" in the term "customer" as it used in FINRA Rule 12200 must be resolved in their favor because of a "strong national public policy favoring arbitration." Appellants' Br. at 19. Appellants rightly point out that arbitration is a favored mechanism of dispute resolution because it provides "speed, economy, and efficiency" and allows a self-regulatory organization such as FINRA to police its members' activities by creating remedies not available in federal court for violations of the organization's rules. *Id.* at 32. But while it is beyond question that the Supreme Court has recognized such advantages and adopted "a liberal federal policy favoring arbitration agreements," *CompuCredit Corp. v. Greenwood*, 132 S. Ct. 665, 669 (2012) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983)) (internal quotation marks omitted), appellants overlook the fact that a court cannot apply any presumption in favor of arbitration unless there already exists an enforceable arbitration agreement between the parties. *See UBS Fin. Svcs. v. Carilion Clinic*, ___ F.3d ___, 2013 WL 239051, at *3 n.2 (4th Cir. 2013).

Arbitration is "a matter of consent, not coercion," *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Jr. Univ.*, 489 U.S. 468, 479 (1989), and federal arbitration policy does not alter

that maxim. As this court has recently noted, the "touchstones of arbitrability analysis" are the "twin pillars" of the parties' "consent and intent" to arbitrate, *Peabody Holding Co. v. United Mine Workers of Am.*, 665 F.3d 96, 103 (4th Cir. 2012). The Supreme Court "has never held that the presumption [in favor of arbitration] overrides the principle that a court may submit to arbitration 'only those disputes . . . the parties have agreed to submit.'" *Carilion Clinic*, 2013 WL 239051, at *3 n.2 (quoting *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 130 S. Ct. 2847, 2858-59 (2010)). The presumption, while certainly a critical component of the law governing arbitration agreements, applies only when "a validly formed and enforceable arbitration agreement is ambiguous about whether it covers the dispute at hand," not when there remains a question as to whether an agreement even exists between the parties in the first place. *Granite Rock Co.*, 130 S. Ct. at 2858; *see also Morgan Keegan & Co. v. Silverman*, ___ F.3d ___, 2013 WL 425556, at *2 n.6 (4th Cir. 2013).

When it accepted FINRA Rule 12200, RJFS agreed to arbitrate disputes with its customers, not with those who fall outside that category. As in both *Morgan Keegan* and *Carilion Clinic*, where we also construed Rule 12200, an agreement to arbitrate exists here "only if a *customer* requests arbitration from a member." *Carilion Clinic*, 2013 WL 239051, at *3 n.2; *see also Morgan Keegan*, 2013 WL 425556, at *2 n.6. Whether appellants are customers thus relates to "the *existence* of a contract to arbitrate," not the "*scope*" of that potential agreement. *Morgan Keegan*, 2013 WL 425556, at *2 n.6 (emphasis added) (quoting *Carilion Clinic*, 2013 WL 239051, at *3 n.2). As such, the presumption in favor of arbitration does not apply to the question of appellants' customer status, and we must consider that issue under ordinary principles of contract law.[1] *Id.*

---

[1]As we noted in *Carilion Clinic*, this court previously applied a presumption in favor of arbitration when construing the term "customer" in

## B.

Appellants argue that they are customers of RJFS because they purchased Inofin securities on the advice of Affeldt, a personal friend and business acquaintance of RJFS registered representative Keough. They emphasize that Keough received commissions from Inofin for Affeldt's sales to appellants, suggesting that Affeldt was acting as Keough's agent in the transactions. This agency relationship, so the argument goes, is enough to make appellants customers of RJFS because they are customers of an agent of an RJFS representative.

Although FINRA itself provides no precise definition of "customer" as used in Rule 12200, our recent decisions in *Morgan Keegan* and *Carilion Clinic* have defined that term to mean "an entity that is 'not a broker or dealer, who purchases commodities or services from a FINRA member in the course of the member's business activities,' namely, 'the activities of investment banking and the securities business.'" *Morgan Keegan*, 2013 WL 425556, at *4 (quoting *Carilion Clinic*, 2013 WL 239051, at *4). Applying that definition to the facts of this case, we conclude that appellants are not RJFS customers because they did not purchase any "commodities or services" from RJFS or Keough in the course of the firm's business activities. Any connection appellants did have to RJFS by virtue of their dealings with Affeldt is far too remote to make them customers of RJFS.

With respect to the Inofin transactions, the appellant investors had no direct customer relationship with RJFS or

"somewhat similar circumstances" in *Washington Square Securities, Inc. v. Aune*, 385 F.3d 432 (4th Cir. 2004). *See Carilion Clinic*, 2013 WL 239051, at *3 n.2. But our holding in that case does not apply here because "in *Washington Square*, the investors were concededly customers of an associated person" of the member firm, *id.*, thus establishing the existence of an arbitration agreement and permitting application of the presumption in favor of arbitration.

Keough. In *Carilion Clinic*, we held that a party seeking arbitration was a "customer" under Rule 12200 because that party had formally contracted with two FINRA members for investment banking services and paid the members directly for those services. 2013 WL 239051, at *6. Here, by contrast, it is undisputed that appellants did not purchase Inofin securities from RJFS, did not have any accounts at RJFS, and did not have any personal contact with Keough regarding Inofin. Moreover, there is no evidence of any contractual relationship between appellants and RJFS regarding the Inofin transactions, nor is there evidence that appellants ever tendered any funds to RJFS in connection with those transactions. Unlike the party seeking arbitration in *Carilion Clinic*, appellants here have not demonstrated that they purchased any service or commodity from a FINRA member that the member sold in its course of business. Thus, appellants fall outside the scope of the term "customer." *See Morgan Keegan*, 2013 WL 425556, at *4.

Lacking a direct connection to RJFS itself, appellants argue that they have an indirect customer relationship to the firm by virtue of their interactions with Affeldt. As the parties' stipulations indicate, between 2006 and 2008, Affeldt "personally met with each of the [appellants] and recommended each invest in Inofin." J.A. 84. All of them did so, and Affeldt and Keough both received commissions from Inofin for the referrals. Appellants' claim to RJFS customer status hinges on their argument that Affeldt was an agent for Keough, such that when appellants were doing business with Affeldt, they were actually doing business with Keough—and by extension with RJFS.

However, as the district court correctly concluded, the arguable connection between appellants and RJFS via Affeldt and Keough is much too attenuated to make appellants customers of RJFS within the meaning of FINRA Rule 12200. In *Morgan Keegan*, we recently held that a FINRA member that issued mutual funds was not required to arbitrate claims made

by investors who purchased their mutual fund shares on the secondary market through a third-party brokerage firm rather than through or from the issuing FINRA member. 2013 WL 425556, at *4-5. We rejected the investors' claims that mere interaction between a member firm and a third party can transform an investor who dealt only with the third party into a customer of the member firm. *Id.* In accordance with that holding, we conclude that Affeldt's connection to Keough does not "transform" appellants into customers of Keough or RJFS. Appellants made their purchases directly from Inofin, on the advice of Affeldt, and made no purchases from or through RJFS or Keough. Affeldt had no actual authority from RJFS to sell or recommend securities on the firm's behalf, nor did he have apparent authority to do so.[2]

The parties' stipulations demonstrate the absence of apparent authority. *See Restatement (Second) of Agency* § 27 (explaining that apparent authority is created by "written or spoken words or any other conduct of the principal which, reasonably interpreted, causes [a] third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him"). It is undisputed that appellants "had no personal contact with Kevin Keough regarding Inofin," "did not understand that they were purchasing Inofin or any other security from Raymond James," and "did not understand they were purchasing Inofin from an agent whom they believed to be authorized to act on behalf of Raymond James." J.A. 84-85. The parties further agree that Affeldt "did not tell any of the [appellants] that he was acting for a person who claimed to be a representative" of RJFS. J.A. 84. That Keough and Affeldt shared commissions and both recruited investors on behalf of Inofin does not save appellants' argument in light of our conclusion that a customer is

---

[2]Any question as to whether RJFS failed to adequately supervise Keough and is thus potentially liable for his arguably unauthorized activities goes to the merits of appellants' claims, not to the arbitrability of those claims. Therefore, we do not address the matter here.

one "who purchases commodities or services *from a FINRA member*." *Morgan Keegan*, 2013 WL 425556, at *4 (emphasis added). Appellants dealt only with Inofin and Affeldt, and appellants are thus not customers of RJFS.

### III.

Arbitration is a favored mechanism of dispute resolution precisely because it helps parties to control legal risk in a more predictable and less capricious fashion. *See Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp.*, 130 S. Ct. 1758, 1774 (2010). When parties have agreed to arbitrate, courts enforce those agreements vigorously to protect the parties' justified expectations concerning their choice of dispute resolution mechanisms and their potential exposure to liability. *Id.* at 1774-75.

By agreeing to FINRA Rule 12200, RJFS consented to arbitration with its customers, not with non-customers such as appellants. To repeat, the investors here never purchased any service or commodity from RJFS during the course of its business activities. To compel RJFS to arbitrate when the firm has not agreed to do so would be to engage in naked coercion independent of any sound basis in law. This in turn would undermine the longstanding principle that arbitration is a consent-based process through which parties can decide for themselves where and how to resolve a specific set of potential disputes. *See Volt*, 489 U.S. at 479. Moreover, compelling arbitration when parties have not agreed to do so would discourage entities from agreeing to arbitrate at all out of fear that such agreements would be stretched too far in the course of judicial construction. This in itself would undermine the federal policy favoring arbitration.

In finding that appellants are not customers of RJFS within the meaning of Rule 12200, we express no view on the merits of the allegations that appellants detail in their FINRA Statement of Claim. The understandable frustration of investors at

fraudulent sales of securities does not liberate courts from their sworn fealty to text, in this case the terms of the arbitration agreement itself. We hold only that RJFS never agreed or consented to arbitrate disputes with the appellants in this case. The judgment of the district court is therefore affirmed.

*AFFIRMED*