**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

## No. 18-1534

DIANA MEY, individually and on behalf of a class of all persons and entities similarly situated,

    Plaintiff - Appellee,

    v.

DIRECTV, LLC,

    Defendant - Appellant,

and

ADAM COX; AC1 COMMUNICATIONS; IQ MARKETING 2, CORP., d/b/a Pacificom; MICHAEL ASGHARI,

    Defendants.

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling.  John Preston Bailey, District Judge.  (5:17-cv-00179-JPB)

Argued:  January 28, 2020                          Decided:  August 7, 2020

Before FLOYD, HARRIS, and RUSHING, Circuit Judges.

Vacated and remanded by published opinion.  Judge Rushing wrote the majority opinion, in which Judge Floyd joined.  Judge Harris wrote a dissenting opinion.

**ARGUED:** Evan Mark Tager, MAYER BROWN LLP, Washington, D.C., for Appellant. Ryan McCune Donovan, HISSAM FORMAN DONOVAN RITCHIE PLLC, Charleston, West Virginia, for Appellee. **ON BRIEF:** Archis A. Parasharami, Daniel E. Jones, MAYER BROWN LLP, Washington, D.C., for Appellant. J. Zak Ritchie, HISSAM FORMAN DONOVAN RITCHIE PLLC, Charleston, West Virginia; John W. Barrett, Jonathan R. Marshall, BAILEY GLASSER LLP, Charleston, West Virginia, for Appellee.

---

RUSHING, Circuit Judge:

Diana Mey sued DIRECTV, LLC and others, alleging that they violated the Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227, by calling her cellular telephone to advertise DIRECTV products and services even though her telephone number is listed on the National Do Not Call Registry. DIRECTV moved to compel arbitration, asserting that the dispute was covered by an arbitration agreement in the contract governing Mey's cellular phone service from AT&T Mobility LLC, a DIRECTV affiliate. The district court denied the motion, concluding that the dispute did not fall within the scope of the arbitration agreement. On appeal, Mey defends the district court's scope ruling and alternatively argues that no agreement was formed. We conclude that Mey formed an agreement to arbitrate with DIRECTV and that this dispute fits within the broad scope of that agreement, construed, as it must be, to favor arbitration.

I.

On March 16, 2012, at an AT&T retail store, Mey opened a new line of service under her husband's existing AT&T Mobility account, for which she was an authorized user. During that transaction, Mey was electronically presented with the AT&T Wireless Customer Agreement, which she could read on the screen or print. After she pressed an on-screen button to "accept" the agreement, Mey electronically signed an acknowledgment saying: "I have reviewed and agree to the rates, terms, and conditions for the wireless products and services described in the Wireless Customer Agreement (including limitation of liability and arbitration provisions) and the Customer Service Summary, both of which were made available to me prior to my signing." J.A. 86. As relevant here, the Wireless

3

Customer Agreement provides that "[y]ou consent to the use by us or our authorized agents of regular mail, predictive or autodialing equipment, email, text messaging, facsimile or other reasonable means to contact you to advise you about our Services or other matters we believe may be of interest to you." J.A. 98.

The Wireless Customer Agreement also includes an arbitration agreement, which provides as follows:

> AT&T and you agree to arbitrate **all disputes and claims** between us. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:
> - claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory;
> - claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising);
> - claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
> - claims that may arise after the termination of this Agreement.
>
> References to "AT&T," "you," and "us" include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us.

J.A. 102. The arbitration agreement also outlines the procedures to be used, including, among others, provisions forbidding class proceedings, requiring AT&T to pay at least $10,000 and double attorneys' fees for any claim found in the customer's favor if the award is greater than the value of AT&T's last written settlement offer, requiring AT&T to pay all arbitration costs for any nonfrivolous claim under $75,000, and preserving both parties' right to bring a claim in small claims court as an alternative to arbitration. "[I]ssues relating

4

to the scope and enforceability" of the arbitration agreement are reserved for courts; otherwise, "[a]ll issues are for the arbitrator to decide." J.A. 103.

In 2015, AT&T, Inc. acquired DIRECTV. AT&T, Inc. now owns both AT&T Mobility and DIRECTV through other corporate entities.

In December 2017, Mey filed a class action complaint against DIRECTV and its hired agents, alleging that DIRECTV's agents unlawfully made automated and pre-recorded telemarketing calls to her AT&T Mobility phone number earlier that year when her number was listed on the National Do Not Call Registry. Mey alleged three counts of violating the TCPA and sought class certification, statutory damages, and injunctive relief.

DIRECTV moved to compel arbitration based on the arbitration agreement in AT&T Mobility's Wireless Customer Agreement. The district court denied the motion on the ground that "the dispute in this case . . . does not fall within the ambit of the arbitration agreement." J.A. 230. The district court reasoned that "the receipt of a telephone call from [DIRECTV] was not an immediate, foreseeable result of the performance[] of the parties' contractual duties or AT&T Mobility's services," J.A. 230, relying on out-of-circuit cases interpreting arbitration provisions that covered disputes "arising out of or relating to" the underlying contracts in those cases, *see* J.A. 224. The court ultimately concluded that "the arbitration clause in this case is susceptible of a construction limiting the duty to arbitrate to disputes arising under or relating to the provision of cellular telephone service," but the court noted in passing its belief that "a construction which does not so limit the scope of the arbitration clause would be unconscionably overbroad." J.A. 233.

5

DIRECTV filed this interlocutory appeal. We have jurisdiction under 9 U.S.C. § 16(a)(1).

## II.

We review a district court's denial of a motion to compel arbitration de novo. *Sydnor v. Conseco Fin. Servicing Corp.*, 252 F.3d 302, 304–305 (4th Cir. 2001). In addition to defending the district court's ruling that this dispute is beyond the scope of the arbitration agreement, Mey also contends that we can affirm on the alternative ground that no agreement to arbitrate was formed. We first address whether an agreement was formed and, finding it was, move on to address the scope of that agreement.

## A.

Arbitration is a matter of contract. The Federal Arbitration Act (FAA), which the parties agree applies here, provides that arbitration contracts are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Act thereby "places arbitration agreements on equal footing with all other contracts," *Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006), and requires courts to enforce them according to their terms, *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 478 (1989). As with any contract, we must first be satisfied that an agreement to arbitrate has been formed. We resolve this question according to state law principles governing contract formation. *See Adkins v. Labor Ready, Inc.*, 303 F.3d 496, 501 (4th Cir. 2002); *cf. Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 296 (2010) (formation is "generally for courts to decide").

6

1.

Mey first argues that she did not sign the arbitration agreement with AT&T Mobility, therefore it does not bind her under West Virginia law. We disagree.

When she opened the new line of service for the cellular phone number involved in the TCPA allegations, Mey signed an acknowledgment stating: "I have reviewed *and agree to* the rates, terms, and conditions for the wireless products and services described in the Wireless Customer Agreement (including limitation of liability and *arbitration provisions*) . . . ." J.A. 86 (emphases added). That acknowledgement suffices to demonstrate her assent to the arbitration agreement. *See New v. Gamestop, Inc.*, 753 S.E.2d 62, 72–73 (W. Va. 2013) (employee agreed to arbitrate by virtue of signing acknowledgement of arbitration policy and continuing employment after receiving policy); *cf. Citizens Telecomms. Co. of W. Va. v. Sheridan*, 799 S.E.2d 144, 149–150 (W. Va. 2017) (customer assented to arbitration agreement by continuing internet service after receiving notice that service provider had amended the terms and conditions of service to add arbitration provision). The arbitration provision to which Mey agreed covers "all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements," J.A. 102; therefore, it does not matter, as Mey contends, that the account was in her husband's name and she was merely an authorized user who purportedly signed on his behalf. *See Schultz v. Verizon Wireless Servs., LLC*, 833 F.3d 975, 980 (8th Cir. 2016) (plaintiff, who had been added as an "account manager" on third party's account and used one of the phone lines to which the contract applied, had activated service and thus accepted the contract, including its arbitration provisions).

7

Because Mey signed an acknowledgement expressly agreeing to the arbitration provision of the Wireless Customer Agreement, which provision applies to her as an authorized user, we reject Mey's argument that she did not form an agreement to arbitrate.

2.

Mey next contends that, even if she consented to arbitration, she did not form an agreement to arbitrate with DIRECTV. *See Adkins*, 303 F.3d at 501 ("It is clear that even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate." (internal quotation marks omitted)). The arbitration agreement declares that "AT&T and you agree to arbitrate all disputes and claims between us." J.A. 102 (emphasis omitted). It then states that "[r]eferences to 'AT&T,' 'you,' and 'us' include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us." J.A. 102. DIRECTV asserts that it is currently an affiliate of AT&T Mobility, and was an affiliate at the time of the events underlying this dispute, therefore it is included in the arbitration agreement's references to "AT&T" and "us." Mey responds that the term "affiliate" should be limited to affiliates of AT&T Mobility existing at the time the arbitration agreement was executed. Because DIRECTV and AT&T Mobility became affiliated only after Mey agreed to arbitrate, she argues that the term cannot cover DIRECTV.[1]

---

[1] DIRECTV suggests that whether it is an "affiliate" is a question not of formation but scope, and so it is entitled to the presumption in favor of arbitration on this issue. DIRECTV produces scant support for its position, *see Adams v. AT&T Mobility, LLC*, 524

As an initial matter, we conclude—as the district court appears to have acknowledged and Mey does not dispute—that DIRECTV is currently an affiliate of AT&T Mobility. *See* J.A. 230. The contract does not define the term "affiliate," so we look to its ordinary meaning. *See Nisbet v. Watson*, 251 S.E.2d 774, 780 (W. Va. 1979) ("This Court has consistently held that the language of a contract must be accorded its plain meaning and, where plain, the language must be given full effect."). An affiliate is commonly understood as "a company effectively controlled by another or associated with others under common ownership or control." *Affiliate*, Webster's Third New International Dictionary 35 (2002); *see Affiliate*, Black's Law Dictionary 67 (9th ed. 2009) ("[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent or sibling corporation"). Since 2015, AT&T, Inc. has owned both AT&T Mobility and DIRECTV through other corporate entities, making them affiliates under common ownership or control. Although Mey considers the relationship attenuated, she does not contest that DIRECTV is currently an affiliate of AT&T Mobility and was an affiliate at the time of the underlying events by virtue of their common ownership.

---

Fed. App. 322, 324 (9th Cir. 2013) (resolving, as a matter of scope, whether parent of successor to wireless contract was included in "us" covered by arbitration clause, without considering whether the issue was one of formation), and our precedent gives us some pause in adopting its view, *see*, *e.g.*, *Raymond James Fin. Servs., Inc. v. Cary*, 709 F.3d 382, 386 (4th Cir. 2013) (reasoning that whether investors were "customers" of appellee covered by FINRA rule requiring arbitration was a question of formation, not scope). Because we agree with DIRECTV's primary argument that the agreement's plain language includes future affiliates, and because the contract here commits both questions of scope and formation to the court, we need not address this alternative argument.

9

Mey does not advance any reason we should restrict the ordinary meaning of "affiliates" here, nor do we find any. The agreement contains no explicit limitation on the term. Of course, we must construe contractual terms in context. *See Chesapeake Appalachia, L.L.C. v. Hickman*, 781 S.E.2d 198, 213 (W. Va. 2015) ("The general state law rule" is that contract terms "are to be read in their context."). And "affiliates" is included in a long list of related entities and individuals. Some of those entities and individuals could be construed primarily as representatives of AT&T Mobility, such as "agents," "employees," "predecessors in interest," "successors," and "assigns." But others, such as "subsidiaries" and "affiliates," are not so limited. *See Corporation*, Black's Law Dictionary 394 (9th ed. 2009) (defining "subsidiary corporation" as "[a] corporation in which a parent corporation has a controlling share"); *Subsidiary*, Webster's Third New International Dictionary 2279 (2002) (defining "subsidiary company" as "a company wholly controlled by another that owns more than half of its voting stock"). Because the terms vary significantly in scope and meaning, it would not be appropriate to apply the associated-words canon (*noscitur a sociis*) to restrict the ordinary meaning of "affiliate." *See Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 288 (2010) (finding *noscitur a sociis* inapplicable, in part because the terms in the relevant list were "each quite distinct from the other" and any "substantive connection . . . between the terms . . . [wa]s not so tight or so self-evident as to demand that we rob any one of them of its independent and ordinary significance" (internal quotation marks omitted)); *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 226 (2008) (finding *noscitur a sociis* inapplicable because statute's reference to "any officer of customs or excise" was not inconsistent with

interpreting statute's inclusion of "any other law enforcement officer" as broadly as its language suggests); 2A Sutherland Statutory Construction § 47:16 (7th ed.) (describing *noscitur a sociis* as applying "when two or more words are grouped together, and ordinarily have a similar meaning, but are not equally comprehensive"). We can discern no shared attribute in this list that would limit "affiliates" to representatives of AT&T Mobility carrying out its telecommunication services or otherwise cabin the plain meaning of the term.[2]

Mey's only argument is that "affiliates" should be limited to affiliates existing at the time the contract was signed and should exclude any affiliates acquired in the future. *Cf. Revitch v. DIRECTV, LLC*, No. 18-CV-01127-JCS, 2018 WL 4030550, at *10 (N.D. Cal. Aug. 23, 2018) (concluding that the term "affiliate" "as commonly understood and as used in the Wireless Agreement includes sibling corporations," but nevertheless holding that the parties did not intend to include future sibling corporations who do not receive "an assignment of any obligations in the original contract"). She identifies nothing in the contract to support this construction. To the contrary, the contractual context suggests the opposite.

As an initial matter, the arbitration agreement explicitly applies to "successors" and "assigns," terms that by definition refer to parties whose identities cannot be known until some point in the future. *See Assign & Assignee*, Black's Law Dictionary 135–136 (9th

---

[2] The inclusion of all affiliates, however, does not mean the inclusion of all disputes with those affiliates. *See infra* Part II.B. Much of Mey's concern about the breadth of the agreement properly relates to interpreting its scope, not formation.

11

ed. 2009) (defining the noun of "assign" as "assignee," which is defined as "[o]ne to whom property rights or powers are transferred by another"); *Assign & Assignee*, Webster's Third New International Dictionary 132 (2002) (defining the noun of "assign" as "assignee," which is defined as "one to whom a right or property is legally transferred"); *Successor*, Black's Law Dictionary 1569 (9th ed. 2009) ("A corporation that, through amalgamation, consolidation, or other assumption of interests, is vested with the rights and duties of an earlier corporation."); *Successor*, Webster's Third New International Dictionary 2282 (2002) ("one that follows"); *Successor & Succeed*, The Am. Heritage Dictionary of the English Language 1740 (5th ed. 2011) (defining "successor" as "[o]ne that succeeds another" and "succeed" as "[t]o come next in time or order; [t]o replace another in office or position"). The arbitration agreement also includes other forward-looking provisions: it applies for the duration of the customer's wireless service and even "survive[s] termination of this [Wireless Customer] Agreement"; it also specifically covers "claims that may arise after the termination of this Agreement." J.A. 102. In addition to "successors" and "assigns," other parties listed ("subsidiaries," "affiliates," "agents," and "employees") are subject to change over the period in which a customer uses the service. In light of the forward-looking nature of the agreement, it is unlikely the parties intended to restrict the covered entities to those existing at the time the agreement was signed. For example, if, years after the agreement was signed, a new AT&T Mobility employee made misrepresentations to Mey about her continuing service, it would seem the parties intended to require arbitration of that dispute, even though the employee was not employed by

12

AT&T Mobility when the agreement was signed. A contrary interpretation would make little sense in a long-term contract.

Mey does not contest the plain meaning of the word "affiliate" or the forward-looking nature of the agreement and its inclusion of "successors" and "assigns." She nevertheless contends that the arbitration agreement is "at best ambiguous" as to whether "affiliates" includes future affiliates and urges us to apply the principle that "'ambiguities in a contract should be construed against the drafter,'" a doctrine known as "*contra proferentem*." Br. of Appellee 16–17 (quoting *CONSOL Energy, Inc. v. Hummel*, 792 S.E.2d 613, 621 (W. Va. 2016)). But that doctrine is triggered "only after a court determines that it *cannot* discern the intent of the parties" from the contract itself. *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1417 (2019). We therefore need not resort to the doctrine. The ordinary meaning of "affiliates" and the contractual context convinces us that the term includes affiliates acquired after the agreement was signed. As a result, Mey formed an agreement to arbitrate with DIRECTV.[3] Our next question is whether that agreement covers this dispute.

B.

"Whether a party has agreed to arbitrate an issue is a matter of contract interpretation: '[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Am. Recovery Corp. v. Computerized Thermal Imaging,*

---

[3] The contract entitles DIRECTV, as an affiliate included in the defined terms "AT&T" and "us," to enforce the arbitration agreement. *See* J.A. 102 ("[Y]ou or AT&T may commence an arbitration proceeding."); *see also* J.A. 102 ("AT&T and you agree to arbitrate all disputes and claims between us." (emphasis omitted)).

13

*Inc.*, 96 F.3d 88, 92 (4th Cir. 1996) (alteration in original) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)); *see Lamps Plus, Inc.*, 139 S. Ct. at 1415. In view of the FAA's "federal policy favoring arbitration," however, "as a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983). "The 'heavy presumption of arbitrability requires that when the scope of the arbitration clause is open to question, a court must decide the question in favor of arbitration.'" *Levin v. Alms and Assocs., Inc.*, 634 F.3d 260, 266 (4th Cir. 2011) (quoting *Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co.*, 867 F.2d 809, 812 (4th Cir. 1989)). Thus, we must resolve a dispute about the scope of an arbitration agreement in favor of arbitration "'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Am. Recovery Corp.*, 96 F.3d at 92 (quoting *Warrior & Gulf Navigation Co.*, 363 U.S. at 582–583).

We note at the outset that, at least in application, the district court here got the standard backwards. The court asked whether the arbitration agreement was "susceptible of a construction *limiting the duty to arbitrate* to disputes arising under or relating to the provision of cellular telephone service." J.A. 233 (emphasis added). In other words, the court resolved the motion to compel by asking whether the arbitration agreement could be interpreted *not* to cover this dispute. But precedent requires us to ask the opposite: whether the arbitration agreement is "'susceptible of an interpretation that covers the asserted

14

dispute.'" *Am. Recovery Corp.*, 96 F.3d at 92 (quoting *Warrior & Gulf Navigation Co.*, 363 U.S. at 582–583). Only if it is not may we deny arbitration.

Mey argues, and the district court agreed, that her claims alleging violations of the TCPA by DIRECTV are not within the scope of the arbitration agreement. Both Mey and the district court rely on cases analyzing arbitration clauses providing that any dispute "arising out of or related to" the underlying contract shall be resolved by arbitration. *See Am. Recovery Corp.*, 96 F.3d at 90; *Long v. Silver*, 248 F.3d 309, 313 (4th Cir. 2001); *Wachovia Bank, Nat'l Assoc. v. Schmidt*, 445 F.3d 762, 766 (4th Cir. 2006); *see also* J.A. 224–228 (discussing out-of-circuit cases interpreting similar arbitration provisions). We have characterized such provisions as "broad arbitration clauses capable of an expansive reach," *Am. Recovery Corp.*, 96 F.3d at 93, and have construed them to cover "disputes that do not arise under the governing contract when a 'significant relationship' exists between the asserted claims and the contract," regardless of the label attached to the dispute, *Long*, 248 F.3d at 316; *see Am. Recovery Corp.*, 96 F.3d at 93; *Wachovia Bank Nat'l Assoc.*, 445 F.3d at 767. *But see Wachovia Bank Nat'l Assoc.*, 445 F.3d at 768 n.5 (recognizing that "to require such a significant relationship" when the arbitration clause requires only that the claims "relate to" the contract "may appear to be in tension with the Supreme Court's mandate that we apply the ordinary tools of contract interpretation in construing an arbitration agreement, and resolve any ambiguities in favor of arbitration"). Mey thus argues that her TCPA claims against DIRECTV do not bear a "significant relationship" to her wireless contract.

15

But the arbitration agreement in Mey's contract is much more expansive than the arbitration provisions in the cases on which she relies. The arbitration agreement here requires arbitration of "**all disputes and claims** between us." J.A. 102. This "includes, but is not limited to . . . claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory." J.A. 102; *cf. United States v. Gonzales*, 520 U.S. 1, 5 (1997) ("[T]he word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.'" (quoting Webster's Third New International Dictionary 97 (1976))). It also includes, among others, "claims that arose before this or any prior Agreement" and "claims that may arise after the termination of this Agreement." J.A. 102. These provisions explicitly contemplate that the agreement covers claims beyond those "arising out of or relating to" the underlying contract. Precedent analyzing whether a "significant relationship" exists between the dispute and the contract, therefore, is inapposite here.

This arbitration agreement—covering "**all disputes and claims** between us"—is far broader than the arbitration clauses in the cases on which Mey relies, indeed, than any case the parties have identified. But we have time and again emphasized that we must interpret and enforce the words of the particular arbitration provision to which the parties agreed. *See Am. Recovery Corp.*, 96 F.3d at 92–93 (holding that district court applied the wrong standard to arbitration clause because it relied on a case interpreting a narrower arbitration provision); *Cara's Notions, Inc. v. Hallmark Cards, Inc.*, 140 F.3d 566, 569, 571 (4th Cir. 1998) (rejecting arguments by plaintiff and district court because "none of them addresses the language of the arbitration clause itself," which required arbitration of "[a]ny

16

controversy or claim arising out of or relating to . . . any aspects of the relationship between [the parties]," which the Court considered "extremely broad").

Read in isolation, the phrase "**all disputes and claims** between us" includes Mey's claims that DIRECTV violated the TCPA by calling her to advertise satellite television products and services. *Cf. Levin*, 634 F.3d at 267 (interpreting integration clause and agreement to arbitrate "[a]ny dispute" to encompass "*all* agreements and *any* disputes, past and present"). Nothing about the phrase is limited to disputes or claims arising out of or relating to the underlying contract or the provision of wireless service. (And recall that DIRECTV is included in "us" because it is an affiliate of AT&T Mobility.) The examples that follow this broad language, however, could inform our understanding of its meaning in context. *See Chesapeake Appalachia, L.L.C.*, 781 S.E.2d at 213. Upon examination we find that, although these examples may guide a proper construction of the meaning of "**all disputes and claims**" in the agreement, they do not exclude Mey's TCPA claims. To the contrary, the more specific terms of the arbitration agreement convince us that this provision can be read to require arbitration of Mey's claims.

Of particular relevance, the arbitration agreement "includes, but is not limited to . . . claims arising out of or relating to any aspect of the relationship between us." J.A. 102. The Wireless Customer Agreement elsewhere states that Mey "consent[s] to the use by us or our authorized agents of regular mail, predictive or autodialing equipment, email, text messaging, facsimile or other reasonable means to contact you to advise you about our Services *or other matters we believe may be of interest to you*." J.A. 98 (emphasis added). One "aspect of the relationship" between Mey and AT&T Mobility and its affiliates under

17

this provision is communication about matters of interest other than AT&T's services, such as advertising affiliates' products and services.[4] *See Cara's Notions, Inc.*, 140 F.3d at 571 (interpreting "any aspects of the relationship" to include conflicts beyond the underlying contract and regarding a separate store that was governed by a separate contract between the parties that lacked an arbitration clause). The arbitration agreement also specifically includes "claims relating to advertising" and claims "based in . . . statute." J.A. 102. Finally, the arbitration agreement itself tells us that the parties intended it "to be broadly interpreted." J.A. 102.

In light of the expansive text of the arbitration agreement, the categories of claims it specifically includes, and the parties' instruction to interpret its provisions broadly, we must conclude that it is "'susceptible of an interpretation'" that covers Mey's TCPA claims. *Am. Recovery Corp.*, 96 F.3d at 92 (quoting *Warrior & Gulf Navigation Co.*, 363 U.S. at 582–583). The text of the agreement arguably contemplates arbitration of Mey's claims, and any ambiguity about whether those claims are included "must be resolved in favor of arbitration." *Lamps Plus, Inc.*, 139 S. Ct. at 1418. Indeed, "the presumption in favor of arbitrability is particularly applicable when the arbitration clause is broadly worded," as it is here. *Levin*, 634 F.3d at 267.

We acknowledge that construing the broadest language of this arbitration agreement in the abstract could lead to troubling hypothetical scenarios. *See* J.A. 232–233 (quoting

---

[4] DIRECTV argues that, by agreeing to this provision, Mey consented to its advertising calls and so DIRECTV did not violate the TCPA. We take no position on that defense to the merits of Mey's claims.

*Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 502–503 (E.D.N.Y. 2016), regarding the "absurd results" that could flow from the broadest possible interpretation of the arbitration agreement in other factual scenarios).[5]  But the question before us today is not abstract; it is tethered to the facts of this dispute and the categories of claims specifically included in this arbitration agreement.  *See Parm v. Bluestem Brands, Inc.*, 898 F.3d 869, 878 (8th Cir. 2018) (rejecting interpretation by hypothetical in favor of looking "to the underlying factual allegations [to] determine whether they fall within the scope of the arbitration clause" (internal quotation marks omitted)).  We need not define the outer limits of this arbitration agreement to conclude, based on the arbitration provisions and the contract as a whole, that Mey's TCPA claims about DIRECTV's advertising calls fall within its scope.

Having interpreted the arbitration agreement to which Mey agreed in accordance with traditional contract principles, and applying the presumption in favor of arbitrability, we must enforce the contract "according to [its] terms."  *Lamps Plus, Inc.*, 139 S. Ct. at 1412; *see* 9 U.S.C. § 2; *Volt Info. Scis., Inc.*, 489 U.S. at 478.  As with any contract, it is not our place to disturb the parties' bargain or relieve a party of the obligations to which it agreed.

---

[5] The court in *Wexler* acknowledged frankly that its concerns implicated unconscionability but feared that "holding that Mobility's arbitration clause is unconscionably broad would be in tension with" *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011), in which the Supreme Court considered another aspect of the same clause. 211 F. Supp. 3d at 504.  In an effort to avoid this potential tension, the court "conclude[d] instead that an arbitration clause that is unlimited in scope presents a question of contract *formation*." *Id.*

## C.

Although the district court concluded that this dispute "does not fall within the ambit of the arbitration agreement," J.A. 230, it opined in passing that "a construction which does not so limit the scope of the arbitration clause would be unconscionably overbroad," J.A. 233. On appeal, DIRECTV argues that Mey waived any unconscionability challenge to the arbitration agreement by failing to raise it in the district court; DIRECTV also contends that the agreement is neither procedurally nor substantively unconscionable. The district court did not address waiver or analyze unconscionability under West Virginia law. We therefore leave this issue for the parties and the district court to address on remand.

\* \* \*

For the foregoing reasons, the district court's order denying the motion to compel arbitration is vacated, and the case is remanded further proceedings not inconsistent with this opinion.

*VACATED AND REMANDED*

20

PAMELA HARRIS, Circuit Judge, dissenting:

In 2012, Diana Mey entered into a cell-phone service contract with AT&T Mobility in which she agreed to arbitrate "all disputes and claims" with AT&T Mobility and its "subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns." Three years later, AT&T Inc. – AT&T Mobility's parent company – acquired DIRECTV, which provides satellite television service, not cell-phone service, and is now connected to AT&T Mobility only by virtue of their shared corporate ownership.

Some years after that, Mey sued DIRECTV for making unwanted telemarketing calls advertising its satellite television service. DIRECTV moved to compel arbitration. It did not claim that Mey ever had been a DIRECTV customer, or had signed any contract with DIRECTV containing an arbitration clause. Instead, DIRECTV relied on Mey's 2012 cell-phone service agreement with AT&T Mobility, arguing that once DIRECTV became a corporate "affiliate" of AT&T Mobility in 2015, that agreement bound Mey to arbitrate "all disputes and claims" against DIRECTV, as well.

I disagree. The first question in any arbitration case is whether the parties agreed to arbitrate. To answer that question, we apply standard principles of contract law, examining the words of the contract in context and asking what a reasonable and objective person would have understood them to convey. In my view, a reasonable person procuring cell-phone service from AT&T Mobility and entering into the accompanying arbitration agreement would have no reason to believe she was signing away her right to sue any and all corporate entities that might later come under the same corporate umbrella as AT&T

21

Mobility, regardless of whether they were connected in any way to the provision of her cell-phone service.

Accordingly, I would affirm the decision of the district court on the threshold question of contract formation: Because Mey never entered into an agreement to arbitrate her claims against DIRECTV, the district court properly denied DIRECTV's motion to compel arbitration.

I.

A.

It is axiomatic that "[a]rbitration is strictly a 'matter of consent,' and thus 'is a way to resolve those disputes – *but only those disputes* – that the parties have agreed to submit to arbitration.'" *Granite Rock Co. v. Int'l Brotherhood of Teamsters*, 561 U.S. 287, 299 (2010) (citations omitted). Accordingly, before a court compels arbitration, it must be satisfied that the parties before it actually agreed to arbitrate the dispute at issue. This inquiry has two parts: First, did the parties enter into a valid agreement to arbitrate in the first instance? And second, if so, does the dispute in question fall within the scope of the arbitration agreement? *See Muriithi v. Shuttle Exp., Inc.*, 712 F.3d 173, 179 (4th Cir. 2013). State contract law generally governs the threshold question of whether an enforceable arbitration agreement exists between litigants, *see First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995); if (and only if) an enforceable agreement exists, then the federal substantive law of arbitrability governs whether the litigants' dispute falls within the scope of that agreement, *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983).

22

This case begins – and in my view, ends – with the first question: whether an agreement to arbitrate exists between Mey and DIRECTV. Under West Virginia law, which all agree applies here, *see* J.A. 144 ("The law of the state of your billing address shall govern this Agreement . . . ."); Appellant's Br. at 15 (applying West Virginia law); Appellee's Br. at 12–13 (same), "[t]he fundamentals of a legal 'contract' are competent parties, legal subject-matter, valuable consideration, and mutual assent. There can be no contract if there is one of these essential elements upon which the minds of the parties are not in agreement." *Virginian Exp. Coal Co. v. Rowland Land Co.*, 131 S.E. 253, Syl. Pt. 5 (W. Va. 1926); *see also New v. GameStop, Inc.*, 753 S.E.2d 62, 70–71 (W. Va. 2013). "The contractual concept of 'meeting of the minds' or 'mutual assent' relates to the parties having the same understanding of the terms of the agreement reached." *Messer v. Huntington Anesthesia Grp., Inc.*, 664 S.E.2d 751, 759 (W. Va. 2008).

All agree that we discern the intention of the parties not by looking to their subjective intent, but rather by examining the ordinary meaning of the words of the contract, judging them according to how an objective, reasonable person would understand them. *See Nisbet v. Watson*, 251 S.E.2d 774, 780 (W. Va. 1979) ("This Court has consistently held that the language of a contract must be accorded its plain meaning and, where plain, the language must be given full effect."); 2 Williston on Contracts § 6:58 (4th ed.) ("[T]he test of the true meaning of an offer or acceptance is not what the party making it thought it meant or intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." (citation omitted)). And we do not focus on the word "affiliate" alone – instead, we consider the language of the arbitration agreement as

23

a whole. *See Murphy v. Van Voorhis*, 119 S.E. 297, 298 (W. Va. 1923) ("The controlling factor in the interpretation of . . . contracts is the intention of the parties, and to arrive at that intention the whole instrument must be carefully scanned.").

B.

With this framework in mind, I turn to the terms of the arbitration agreement in Mey's AT&T Mobility contract. In relevant part, it reads as follows:

> AT&T and you agree to arbitrate **all disputes and claims** between us. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:
>
> - claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, statute, fraud, misrepresentation or any other legal theory;
>
> - claims that arose before this or any prior Agreement (including, but not limited to, claims relating to advertising);
>
> - claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
>
> - claims that may arise after the termination of this Agreement.
>
> References to "AT&T," "you," and "us" include our respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns, as well as all authorized or unauthorized users or beneficiaries of services or Devices under this or prior Agreements between us.

J.A. 102.

What would a reasonable person signing this agreement have understood "affiliate" to mean? Here, I must part ways with my colleagues in the majority. Considering this term as a part of Mey's cell-phone service agreement, it is clear that a reasonable person would understand "affiliates" as referring to entities stepping into the shoes of AT&T

24

Mobility in some respect, assisting AT&T Mobility in the provision of the customer's cell-phone service or otherwise assuming AT&T Mobility's obligations under the contract.

We begin, of course, with the text. DIRECTV marshals various dictionary definitions in urging us to conclude that "[t]wo entities are 'affiliates' if they are under common ownership by a third party," Appellant's Br. at 17–18, and the majority similarly emphasizes those dictionary definitions, *see* Majority Op. 9. But the edict that we are to enforce the plain language of a contract does not absolve the court from its duty to consider the whole agreement; indeed, we cannot discern the plain meaning without considering the context in which the parties encountered it. *See Murphy*, 119 S.E. at 298; *cf. Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1743, 1748, *reh'g denied*, 140 S. Ct. 17 (2019) ("Of course the term 'defendant,' standing alone, is broad. But the phrase . . . 'cannot be construed in a vacuum.'"); *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) ("[W]hen deciding whether the language [of a statute] is plain, we must read the words 'in their context and with a view to their place in the overall statutory scheme.'"); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.").

And here, context is key. We consider the term "affiliate" as a part of Mey's cell-phone service agreement, as it would be understood by a reasonable person "engag[ed] in the 'mundane act of buying [] wireless service from AT&T Mobility.'" *See Revitch v. DIRECTV, LLC*, No. 18-CV-01127-JCS, 2018 WL 4030550, at *8 (N.D. Cal. Aug. 23, 2018) (construing same arbitration agreement). That reasonable person would have no

25

reason to understand "affiliate" as referring to *any* entity under common ownership with AT&T Mobility, at any time and for any reason. Instead, she quite reasonably would assume that this term covered entities related to AT&T Mobility by virtue of their participation, in some way, in the provision of service under the contract she was signing. *See id.* at \*12–\*13.

To start, there is the clause at the heart of this case, defining AT&T Mobility to include not only the company's "affiliates," but also its "subsidiaries . . . agents, employees, predecessors in interest, successors, and assigns." J.A. 102. Taken together, what that list conveys is that a customer cannot circumvent her arbitration agreement with AT&T Mobility by suing some related entity that is acting on AT&T Mobility's behalf with respect to the contract she is signing. If AT&T Mobility is providing inadequate technical support for her cell phone, in other words, she cannot sue AT&T Mobility, and she also cannot sue the AT&T Mobility customer service employee who failed to remedy her phone's technical issue. Similarly, her obligation to arbitrate her claims against AT&T Mobility will extend to an assignee who has taken over AT&T Mobility's obligations in providing her with cell-phone service, or the affiliated corporation handling the billing for her account. *See Revitch*, 2018 WL 4030550, at \*12 (definition of AT&T Mobility extends to a "new entity stepp[ing] into the shoes of AT&T Mobility" under the contract); *cf. J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 320–21 (4th Cir. 1988) (explaining that parent company may invoke arbitration agreement with subsidiary where forcing parent corporation to litigate would render arbitration agreement meaningless). AT&T Mobility's arbitration agreement is written to prevent an end-run around arbitration

26

by suing some other related entity, not to capture a post-agreement change in corporate parenthood that has nothing to do with cell-phone service. *See Revitch*, 2018 WL 4030550, at *12.

Other portions of the arbitration agreement confirm this reading. The arbitration provision is set forth in Section 2.0 of the AT&T Mobility customer agreement, entitled "HOW DO I RESOLVE DISPUTES WITH AT&T?" J.A. 102. First, Section 2.1, entitled "Dispute Resolution By Binding Arbitration," provides a "Summary" of the arbitration provision, explaining:

> Most customer concerns can be resolved quickly and to the customer's satisfaction by calling our customer service department at 1-800-331-0500. **In the unlikely event that AT&T's customer service department is unable to resolve a complaint you may have to your satisfaction . . . we each agree to resolve those disputes through binding arbitration . . . instead of in courts of general jurisdiction.**

*Id.* The fact that customers are encouraged to contact AT&T Mobility's customer service department prior to initiating arbitration – including arbitration with an "affiliate" – indicates that the agreement applies only to those affiliates who are, or will be in the future, acting on AT&T Mobility's behalf. It would make little sense for an AT&T Mobility customer to call AT&T Mobility's customer service department to ask for help regarding, for example, a wrongful death claim against an employee of DIRECTV – a "corporate cousin[] at least seven times removed," *Mey v. DIRECTV, LLC*, No. 5:17-CV-179, 2018 WL 7823097, at *5 (N.D.W. Va. Apr. 25, 2018). And the process the contract sets out for initiating arbitration reinforces that notion. Section 2.2, which contains the text of the arbitration provision set forth above, also directs "[a] party who intends to seek arbitration"

27

to send "by certified mail, a written Notice of Dispute . . . addressed to: Office for Dispute Resolution, AT&T, 1025 Lenox Park Blvd., Atlanta, GA 30319." J.A. 102–103. It would similarly defy logic for an AT&T Mobility customer to send AT&T Mobility a notice that they intend to bring a claim against, for example, HBO – another corporate cousin – for employment discrimination.

The problem for DIRECTV, then, is not just that it concededly was not affiliated with AT&T Mobility at the time Mey signed her cell-phone service contract in 2012. Indeed, to the extent that Mey argues that no future affiliate ever could enforce this arbitration clause, I agree with the majority that this position is unconvincing, *see* Majority Op. 8, 11, and adopt Mey's position only in part. What makes it clear that DIRECTV is not an "affiliate" under the plain meaning of the contract is both that it had no relation to AT&T Mobility at that time, *and* that its future relationship to AT&T Mobility has absolutely nothing to do with the provision of services under the contract. For those reasons, a reasonable person would not anticipate arbitrating with DIRECTV, whose later affiliation with AT&T Mobility occurred by happenstance – "the completely fortuitous fact that a holding company that indirectly owns AT&T Mobility acquired [it]" at some point down the line, *Revitch*, 2018 WL 4030550, at *12 – and bears no relation to AT&T Mobility's provision of cell-phone service under Mey's contract.

Contrary to DIRECTV's characterization, this conclusion does not render the term "affiliates" somehow "frozen in time" as of the date of the contract, Appellant's Br. at 18. It simply means that as a matter of common sense, a reasonable person entering into her cell-phone service contract would not anticipate "affiliate" to mean any and every

28

corporation that may become affiliated with AT&T Mobility in the future, *regardless of the purpose of that affiliation*. Instead, a reasonable person would be left with the impression that any claims against an entity related to AT&T Mobility's provision of her cell-phone service must be resolved by arbitration, assuming AT&T Mobility customer service cannot resolve them first.

The only other case to have addressed this precise question, *Revitch v. DIRECTV, LLC*, No. 18-CV-01127-JCS, 2018 WL 4030550 (N.D. Cal. Aug. 23, 2018), reached precisely the same conclusion. (Although *Revitch* was issued shortly before briefing was complete in this case, DIRECTV surely is familiar with it; DIRECTV was a party in the case, represented by the same counsel who represents it here.) That case is on all fours with this one: Revitch received unsolicited calls from DIRECTV advertising its satellite television services, he brought a TCPA claim, and DIRECTV moved to compel arbitration based on an AT&T Mobility cell-phone service contract identical to the one in this case. The court first determined that the term affiliate, "as a general matter, was intended to include . . . entities owned (directly or indirectly) by the same holding company," *id.* at \*10 – basically the definition DIRECTV urges here. But that did not end the inquiry, the court held, "because the question remain[ed] whether Revitch intended to enter an agreement to arbitrate with an entity that became affiliated with AT&T Mobility long after he entered into the original contract," and only "by virtue of an entirely fortuitous event" – that DIRECTV happened to be acquired by a company that also owns AT&T Mobility. *Id.* at \*11. In other words, did "affiliate" – in the context of this agreement and from the

29

perspective of a reasonable person entering into the contract – include an entity like DIRECTV?

That court, like the district court in this case, concluded that it did not, rejecting DIRECTV's notion that a reasonable customer would, "merely by agreeing to a contract to receive wireless service," believe themselves to be agreeing to arbitrate "not only disputes that might arise with the service provider relating to that service[,] but virtually any sort of dispute the customer might have against any entity that might in the future be acquired by the holding company that owns the service provider." *Id.* at *15. Instead, a reasonable customer would assume an entity was an "affiliate" where the relationship between the party seeking to compel arbitration – here, DIRECTV – and the original contracting party – here, AT&T Mobility – was connected in some way to the AT&T Mobility cell-phone service contract. *Id.* at *13.

## II.

None of DIRECTV's arguments to the contrary are compelling. In fact, each reinforces the conclusion that "affiliate" is best understood, in this context, as an entity that is aiding AT&T Mobility in the implementation of the underlying contract.

## A.

First, DIRECTV's insistence that we read "affiliates" in the context of "the broad, forward-looking language of the arbitration provision and the Wireless Customer Agreement as a whole," Appellant's Br. at 18, does little for its position. DIRECTV is correct that the agreement contains some explicitly forward-looking language, covering "successors" and "assigns" of AT&T Mobility, "words that by definition refer to parties

30

whose identities cannot be known until the future." *Id.* True enough, but beside the point; as already discussed, this temporal aspect is not determinative. Of course *some* entities whose precise identities are not known to the AT&T Mobility customer at the time of signing may well be covered, but only where their future relationship to AT&T Mobility's provision of the contract is reasonably foreseeable. That is exactly the case with the language DIRECTV points to – "successors" and "assigns" – which are words that, by definition, refer to parties who will be acting on behalf of a principal or in one's stead. *See Assign*, Oxford English Dictionary Online ("1. One who is appointed to act for another, a deputy, agent, or representative, 2. One to whom a property or right is legally transferred."); *Successor*, Oxford English Dictionary Online ("One who succeeds another in an office, dignity, function, or position."). Similarly, the term "employees" necessarily implies working on behalf of AT&T Mobility – which explains why the agreement covers employees without temporal limitation, but not where such individuals are not acting as employees. (For example, an individual in AT&T Mobility's accounting office who overcharges you on your cell phone bill would be an "employee" for the purposes of this contract; an individual who picks your pocket at the bus stop and also happens to work at an AT&T Mobility retail store would not.) Though the precise identity of certain entities and individuals may not be known at the time the contract is signed, a reasonable person reading the agreement would understand this list to include entities – both current and future – acting on AT&T Mobility's behalf.

DIRECTV's reliance on other forward-looking language in the agreement fares no better. For instance, DIRECTV notes that the arbitration provision covers "claims that may

31

arise after the termination of this Agreement," Appellant's Br. at 19 (quoting J.A. 102), and that the contract separately includes an agreement to be contacted about "[AT&T Mobility's] Services or other matters we believe may be of interest to you," *id.* (quoting J.A. 98). But this language has no bearing on the inquiry at hand: It "governs only the types of claims that must be arbitrated, not the entities that may invoke the arbitration clause." *Revitch*, 2018 WL 4030550, at *13.

Next, DIRECTV relies on three cases in which courts have held, roughly speaking, that entities that became affiliates or agents of a corporate party to an arbitration agreement only *after* the time of contracting nevertheless could invoke the arbitration agreement against the other signatory. But again, it is not timing alone that makes it clear that DIRECTV is not an "affiliate" within the meaning of this arbitration agreement. And all of the cases cited by DIRECTV share significant characteristics that are conspicuously absent from the case before us. First, the party seeking to enforce the arbitration agreement in those cases was either the assignee, successor, or agent of the initial contracting corporation – unlike the post hoc, corporate-cousins-seven-times-removed relationship between AT&T Mobility and DIRECTV here. *See Andermann v. Sprint Spectrum LP*, 785 F.3d 1157, 1158 (7th Cir. 2015) ("Sprint," the assignee, "had stepped into U.S. Cellular's shoes."); *Adams v. AT&T Mobility, LLC*, 524 F. App'x 322, 324 (9th Cir. 2013) (contract terms "we" and "us" included successor's parent company); *Clarke v. Alltran Fin., LP*, 2018 WL 1036951, at *5 (E.D.N.Y. Feb. 22, 2018) (debt collector serving as credit card company's "agent"). And in addition, the party seeking to arbitrate in those cases was engaged by the signatory corporation for the purpose of carrying out or enforcing the

32

underlying agreement – again, in contrast to the totally fortuitous relationship between AT&T Mobility and DIRECTV, having nothing to do with the cell-service contract. *See Andermann*, 785 F.3d at 1158 (signatory sold entire cell-service contract to party seeking to arbitrate); *Adams*, 524 F. App'x at 324 (signatory sold entire cell-service contract to subsidiary of party seeking to arbitrate); *Clarke*, 2018 WL 1036951, at *5 (signatory retained party seeking to enforce arbitration to collect amounts owed pursuant to contract). In other words, these cases support what the plain language of this agreement makes clear: that "affiliates" means an entity stepping into AT&T Mobility's shoes for purposes related to the cell-phone service agreement.

## B.

DIRECTV appeals not only to particular "forward-looking" language but also to the general breadth of the arbitration clause in Mey's agreement with AT&T Mobility, suggesting that this context compels a broad reading of the term "affiliate," as well. But that has it exactly backwards: Given the boundless scope of the arbitration clause in question, construing "affiliate" to cover entities like DIRECTV would lead to results so absurd that no reasonable person could have intended or anticipated that they would follow from her cell-phone service agreement. *See Revitch*, 2018 WL 4030550, at *13; *see also, e.g.*, *D'Annunzio v. Security-Connecticut Life Ins. Co.*, 410 S.E.2d 275, 276 Syl. Pt. 2 (W. Va. 1991) (contracts "should never be interpreted so as to create an absurd result, but instead should receive a reasonable interpretation, consistent with the intent of the parties").

33

First, of course, is the feature central to this dispute: AT&T Mobility's arbitration clause covers not only AT&T Mobility and the customer who signs it, but also their "respective subsidiaries, affiliates, agents, employees, predecessors in interest, successors, and assigns." J.A. 102. But that is not the only sweeping provision in this agreement. When it comes to subject matter, the arbitration clause purports to cover "all disputes and claims between" those covered entities, without limit and regardless of whether they are related to the underlying contract. *Id.* Finally, it covers both claims that arose before the agreement and those that arise only *after* a customer terminates her cell-phone service agreement with AT&T Mobility. *See id.* In other words, the arbitration clause is strikingly broad as to the who, what, and when of coverage: The "who" is not limited to AT&T Mobility, but rather includes certain third parties; the "what" is all disputes and claims between customers and those entities; and the "when" is, by terms, forever.

Given the agreement's reach, it is not surprising that DIRECTV cannot identify a case supporting its interpretation – that is, that an entity with no relationship to the contracting parties at the time of the contract, and an at-most tangential relationship to one of the contracting parties later, can enforce an arbitration agreement. Arbitration clauses generally are limited in subject-matter scope to claims "arising out of or relating to" the contract containing the arbitration agreement. The American Arbitration Association's model arbitration clause, for instance, provides that "[a]ny controversy or claim *arising out of or relating to* this contract, or the breach thereof, shall be settled by arbitration." *Commercial Arbitration Rules and Mediation Procedures* (Amended and Effective Oct. 1, 2013), 2018 WL 2117639, at *2 (emphasis added); *see also Mitsubishi Motors Corp. v.*

34

*Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 647 (1985) (Stevens, J., dissenting) (noting that a "standard arbitration clause" is one that refers to "claims arising out of or relating to a contract"); David Horton, *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev. 633, 639 (2020) (hereinafter "Infinite Arbitration Clauses") ("Traditionally, companies only attempted to mandate arbitration of disputes that were connected to the contract that included the arbitration provision."). In those cases, an entity like DIRECTV – which provides no services under the contract in question – by definition would have no occasion to seek its enforcement.

But AT&T Mobility's contract is different: Instead of this standard arbitration clause, it purports to cover "all disputes and claims between" the customer and AT&T Mobility, or between the customer and certain other entities beyond AT&T Mobility, without exception and for all time. That kind of arbitration clause – what one scholar has termed an "infinite arbitration clause" – is relatively new and untested. *See Infinite Arbitration Clauses*, 168 U. Pa. L. Rev., at 639. So it falls to us to consider the results that would follow if, as DIRECTV urges, the AT&T Mobility agreement covers any entity that AT&T Inc. happens to acquire at any point after the agreement is signed.

Imagine, for instance, that a customer signed up for AT&T Mobility cell-phone service in 2010 but canceled the following year; she has been a loyal customer of a different cellular provider for the decade since. Imagine, too, that she now happens to be a federal judge; that someone at CNN did not like an opinion she authored; and that to ruin her reputation, CNN reports during prime time that she was drunk on the bench during oral argument. She subsequently sues for defamation, but CNN objects: Because AT&T Inc.,

AT&T Mobility's parent company, merged with Time Warner, CNN's parent company, in 2018 – eight years after her AT&T Mobility cell-phone service ended – she is obligated to arbitrate her defamation claim against CNN, based on her decade-old and now defunct cell-service contract with AT&T Mobility. On DIRECTV's telling, CNN prevails, and she is bound to arbitrate – no matter that CNN had no connection to AT&T Mobility at the time she had AT&T Mobility cell service, and no matter that even now, CNN has nothing to do with AT&T Mobility's cell service.

Consider a second situation: An individual who happens to be an AT&T Mobility customer sues a driver who rear-ended him in rush hour traffic. The parties have litigated for months, and are on the eve of trial when the defendant comes into court with an eleventh-hour motion to compel arbitration: She has just this morning been hired by AT&T Mobility as a customer service representative, and that means, she claims, the plaintiff has waived his right to sue. Because she is now an employee of AT&T Mobility, and because he agreed to arbitrate "all disputes and claims" between him and AT&T's "employees" when he signed up for his cell-phone service, he is no longer entitled to his day in court on his tort claim. Once again, DIRECTV says, he is bound to arbitrate.

There is nothing far-fetched about the situations just described; indeed, they are the straightforward result of DIRECTV's position in this case. And in fact, at oral argument – and despite my colleagues' invitation to consider a more modest position – DIRECTV embraced precisely these scenarios, insisting that they fell squarely within the hypothetical cell-phone customer's agreement to arbitrate with AT&T Mobility. In my view, that is not a sustainable position. No reasonable person procuring cell-phone service from AT&T

36

Mobility and reading the attendant arbitration clause would understand "affiliate" to include any and all future corporate cousins, as yet unidentifiable, and regardless of whether their relationship with AT&T Mobility would have anything to do with the provision of services under her cell-phone contract.[6*]

C.

Finally, DIRECTV attempts to circumvent this clear conclusion by invoking the "healthy regard for the federal policy favoring arbitration," *Moses H. Cone*, 460 U.S. at 24. That effort is misguided. The presumption DIRECTV depends on has no application where, as here, the question is one of contract formation rather than scope. And even if it did apply, the presumption is just that – a presumption – and it would not override the only sensible reading of the contractual language at issue.

As explained above, whether the parties have agreed to arbitrate a particular dispute turns on the answers to two distinct questions: first, whether the parties – here, Mey and DIRECTV – have entered into an agreement with each other to arbitrate at all; and second,

---

[*] In its one concession to the absurdity of the results it is embracing, DIRECTV assured us that we could use the unconscionability doctrine to write reasonable limits into the contractual language in particularly egregious cases. But that is not responsive to the threshold question of contract *formation*, and whether an objective and reasonable person in Mey's shoes would understand herself to be entering into an agreement with DIRECTV in the first place. Before we get to unconscionability, in other words, there must be a valid agreement to arbitrate. DIRECTV would have us disregard this order of analysis, reverse-engineering the contract-formation inquiry at the back end through the doctrine of unconscionability. But that misunderstands the division of labor in arbitration cases – it is up to corporations like AT&T Mobility and their lawyers, not judges, to write sensible arbitration agreements, and salvaging overly ambitious arbitration clauses is not part of our job description – to say nothing of the fundamental precept that "[a]rbitration is strictly a 'matter of consent.'" *Granite Rock*, 561 U.S. at 299.

if they have, whether their dispute falls within the scope of that agreement. The presumption of arbitrability applies to the second question, regarding scope: "[A]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone*, 460 U.S. at 24–25. But it does not apply to the first, as to the existence of an agreement between the parties to arbitrate. *See, e.g.*, *Raymond James Fin. Servs., Inc. v. Cary*, 709 F.3d 382, 386 (4th Cir. 2013). This is an important distinction. Because arbitration is a creature of contract, courts apply "the presumption favoring arbitration . . . only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed." *Granite Rock Co.*, 561 U.S. at 302. If no agreement to arbitrate exists, then there is no role to be played by a presumption in favor of such agreements.

Our precedent makes clear that whether Mey agreed to arbitrate against DIRECTV – as opposed to AT&T Mobility – is a threshold question of contract formation, not of scope. As this court has recognized on many occasions, the question of *who* is subject to an arbitration agreement goes to whether there is an agreement to arbitrate at all, rather than to the scope of any such agreement. *See, e.g.*, *Raymond James*, 709 F.3d at 385; *UBS Fin. Servs., Inc. v. Carilion Clinic*, 706 F.3d 319, 324 n.2 (4th Cir. 2013). On my view of the case, Mey never agreed to arbitrate her dispute against DIRECTV as an "affiliate" of AT&T Mobility – which means we never get to the question of the arbitration clause's scope, and thus never have occasion to apply the presumption of arbitrability.

That is enough to dispose of DIRECTV's argument that the presumption should be employed in its favor. But for the record, I think the answer to the question we face here – viewing the contractual language objectively and in context, would a reasonable person in Mey's position understand herself to be entering into an agreement to arbitrate her claim against DIRECTV when she signed her contract with AT&T Mobility? – is clear enough that no presumption could override it. The presumption of arbitrability invoked by DIRECTV is just that – a presumption; it is not an all-purpose trump card that suspends the ordinary rules of contract interpretation. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) ("[C]ourts must place arbitration agreements on an equal footing with other contracts . . . and enforce them according to their terms."). And under those ordinary state-law standards, no reasonable AT&T Mobility customer would believe, on signing her arbitration agreement, that she was consenting to arbitrate not only with AT&T Mobility but also, and for all time, with any entity that ever might share a corporate umbrella with AT&T Mobility. Arbitration is, foundationally, "a matter of consent," *Granite Rock*, 561 U.S. at 299, and we may not foist arbitration on a party who has not agreed to it under cover of a presumption.

III.

The preceding analysis is determinative: Mey did not agree to arbitrate against DIRECTV, and that is that. So unlike the majority, I need not go on to consider whether, had there been such an agreement, Mey's TCPA claim would fall within its scope. But because this issue is central to the majority's analysis, I address it briefly, to explain why I am unconvinced.

39

First, the majority relies heavily here on the presumption in favor of arbitration. And while I agree, as discussed above, that the presumption generally applies to disputes regarding the scope of an arbitration agreement, I question whether it applies to this particular arbitration clause. That is because, as the majority emphasizes, the scope of this arbitration agreement – purporting to reach "all disputes and claims" between the parties – is far more expansive than the already-broad standard agreement, which covers those disputes "arising out of or related to" the underlying contract. *See, e.g.*, *Wachovia Bank, Nat'l Assoc. v. Schmidt*, 445 F.3d 762, 767 (4th Cir. 2006) (collecting cases). And the FAA, from which the presumption of arbitrability is derived, mandates enforcement not of all arbitration agreements, but only agreements set forth in "a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter *arising out of such contract* or transaction." 9 U.S.C. § 2 (emphasis added). By plain terms, then, the FAA presupposes a "contractual nexus," governing only those "disputes that are tied [] in some meaningful way to the parties' agreement." *Infinite Arbitration Clauses*, 168 U. Pa. L. Rev., at 643; *see also id.* (explaining that Congress modeled the FAA on New York's arbitration statute, which applied to any lawsuit "arising between the parties," but chose instead to narrow the text of the FAA to cases "arising out of" the parties' contract).

Precisely because the arbitration clause here is so unusually broad, we have not before had occasion to consider whether the presumption of arbitrability could apply to an agreement that purports to extend beyond the text of the FAA to reach claims and disputes that do *not* arise under or relate to the underlying contract. But without a link to the FAA itself, I can see no warrant for application of the presumption of arbitrability, and thus have

40

serious doubts about whether it should apply here. *See Hearn v. Comcast Cable Commc'ns, LLC*, 415 F. Supp. 3d 1155, 1158, 1165 (N.D. Ga. 2019) (holding that arbitration provision that "deviates from the statutory language of the Federal Arbitration Act," purporting to cover "any claim or controversy," manifests intent to arbitrate only those claims arising under or related to the contract).

In any event, and for much the same reason I conclude that no agreement to arbitrate exists in the first instance, I question whether an objective, reasonable person signing her cell-phone service contract with AT&T Mobility would be expressing an intent to arbitrate "literally every possible dispute [] she might have with the service provider," rather than all disputes related to the contract and the provision of cell-phone services. *See Wexler v. AT&T Corp.*, 211 F. Supp. 3d 500, 501, 504 (E.D.N.Y. 2016) (construing identical agreement "to arbitrate all disputes and claims between us" and concluding that "a reasonable person would be expressing, at most, an intent to agree to arbitrate disputes connected in some way to the service agreement with [AT&T Mobility]"). And indeed, recent cases considering a spate of these new "infinite" arbitration agreements – cases in which, unlike this one, there is no question as to the identity of the contracting parties – have resisted their broad application, holding that there is no actual agreement to arbitrate claims unrelated to the underlying contract, *see Wexler*, 211 F. Supp. 3d at 503–04, or construing the scope of the agreement as limited to claims arising under or related to the contract, *see, e.g.*, *Hearn*, 415 F. Supp. 3d 1155 at 1158, 1165 (Fair Credit Reporting Act claim against Comcast did not relate to prior service agreement between parties and thus did not fall within scope of agreement to arbitrate "any claim or controversy"); *Johnson v.*

41

*AT & T Mobility, LLC*, No. 4:09-CV-4104, 2010 WL 5342825, at \*3 n.2 (S.D. Tex. Dec. 21, 2010) (agreeing that arbitration clause identical to one at issue here was "not boundless": "perhaps if Plaintiff were injured after being struck by an [AT&T Mobility] vehicle," that would fall outside the scope).

The majority recognizes these concerns, and instead of relying on the "all disputes and claims" language alone, it uses the "examples that follow this broad language" to satisfy itself that there is some nexus between the agreement and Mey's TCPA claim against DIRECTV. Majority Op. 16–17. And although DIRECTV relies primarily on the "all disputes and claims" clause, it, too, falls back on the position that Mey's TCPA claim is in any event related to her contract with AT&T Mobility. Here again, I have my doubts.

DIRECTV argues, for instance, that Mey's TCPA claims are related to her AT&T Mobility contract because the calls at issue "were placed to an existing AT&T customer on her AT&T phone number to encourage her to procure services from an AT&T Mobility affiliate," and Mey's subsequent claims are "based upon the cross-selling of services across the AT&T brand." Appellant's Br. at 22. But none of that explains how the "services" in question – DIRECTV's internet television services – are in any way related to Mey's AT&T Mobility cell-phone service contract. That DIRECTV and AT&T Mobility both now happen to be owned by the same parent corporation does not mean that they provide related services, and in fact, they do not: Mey, of course, contracted with AT&T Mobility to provide *cell-phone* service. DIRECTV, on the other hand, describes itself as "a premier *television* provider," delivering video entertainment by satellite and internet streaming, *Why Choose DIRECTV?*, https://www.directv.com (last visited Aug. 4, 2020) (emphasis

added), and Mey's complaint alleges that the calls at issue encouraged her to sign up for precisely that television service, with the following pre-recorded message:

> Are you paying too much for your TV service? Hi! We're the premier television provider for this area. We have the lowest per channel cost in the industry with more than 140 channels including local channels for only $29.99 per month. . . . To hear more about this special offer, press 1 now. . .

J.A. 10. Unless we are prepared to lump all vaguely technology-adjacent services together, there is nothing relating DIRECTV's television services to the cell-phone service provided to Mey by AT&T Mobility.

DIRECTV, like the majority, also focuses on a clause in AT&T Mobility's cell-service agreement providing that the customer, by signing, "consent[s] to the use by us or our authorized agents of . . . reasonable means to contact you to advise you about our Services or other matters we believe may be of interest to you." J.A. 98. On DIRECTV's telling, "[t]hat provision thus expressly contemplates that AT&T's customers will receive advertising calls for other services offered by AT&T and its *affiliates and subsidiaries*, like DIRECTV television service." Appellant's Br. at 23 (emphasis added). But there is no reason to read this "consent" provision as extending to messages from affiliates and subsidiaries. Unlike the arbitration provision, which defines "AT&T" and "us" to include "affiliates" and "subsidiaries," this separate provision – which appears in an entirely separate section – contains no reference to affiliates or subsidiaries, and no definition at all of "us or our authorized agents," "our," or "we." *See* J.A. 98 (customers consent to be contacted by "*us or our authorized agents* . . . about *our* Services or other matters *we* believe may be of interest to you" (emphasis added)). So the use of those terms is defined

43

by the general definitions set out in the agreement's preamble, providing that "us" and "our" refer only "to AT&T Mobility LLC, acting on behalf of its FCC-licensed affiliates doing business as AT&T." J.A. 94. In short, "there is nothing to suggest [that the consent provision] was intended to cover advertising of unrelated services by 'affiliates'" like DIRECTV. *Revitch*, 2018 WL 4030550, at \*15.

IV.

At bottom, I simply cannot agree that a reasonable customer walking into AT&T Mobility and signing the cell-phone service agreement at issue is manifesting an intent to waive her right, permanently, to sue any entity that may become somehow connected to AT&T Mobility in the future – however distantly, and for any purpose. The Supreme Court has repeatedly emphasized that arbitration "is a matter of consent, not coercion." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Univ.*, 489 U.S. 468, 479 (1989); *see also, e.g.*, *Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415 (2019); *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 681 (2010); *Granite Rock*, 561 U.S. at 299; *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83 (2002); *First Options*, 514 U.S. at 943; *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57 (1995); *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985). DIRECTV's position turns this "foundational FAA principle," *Stolt-Nielsen*, 559 U.S. at 684, on its head, assuming an intent to arbitrate with an entity whose existence a reasonable person would have no reason even to consider when checking a box to purchase her cell-phone service.

We should be clear about the consequences of DIRECTV's unprecedented position in this case. AT&T Mobility is the nation's largest wireless service provider, with *165.9 million* current wireless subscribers. *See* AT&T, *Q4 2019 AT&T Investor Briefing* (Jan. 29, 2020), https://about.att.com/ecms/dam/snrdocs/Earnings/AT&T%204Q19%20 Investor%20Briefing.pdf (last visited Aug. 4, 2020). For a sense of scale, the current population of the United States is approximately 330 million. U.S. Census Bureau, *U.S. and World Population Clock*, https://www.census.gov/popclock/ (last visited Aug. 4, 2020). So even without taking into account previous AT&T Mobility customers – who, as discussed above, also remain bound by the arbitration clauses in their agreements with their former wireless carrier – DIRECTV's reading of the arbitration agreement means that half the country is bound to arbitrate any dispute, occurring at any time, with any entity that ever is subsumed under the massive AT&T Inc. corporate umbrella. And of course, DIRECTV is not the only corporate cousin of AT&T Mobility that could take advantage of this unbounded reading of the arbitration agreement: According to AT&T Inc.'s most recent filing with the SEC, it has thirty-six principal subsidiaries – including Warner Bros., HBO, and Turner – each of which may well have its own subsidiary corporations. *See Principal Subsidiaries of AT&T Inc., as of October 1, 2018*, https://bit.ly/2S3RphN (last visited Aug. 4, 2020). In DIRECTV's view, every one of those entities is an "affiliate" of AT&T Mobility for the purposes of the arbitration agreement in its cell-phone service contract, so no AT&T Mobility customer – present or former – may sue any one of them, for any reason.

45

Because I believe that this conclusion badly distorts the bedrock notion that arbitration is a matter of consent, I must respectfully dissent.